The PEOPLE of the State of Colorado,
Plaintiff-Appellant,

v.

Robert Lee FRANKLIN,
Defendant-Appellee.

No. 81SA227.

Supreme Court of Colorado,
En Banc.

April 26, 1982.

R. Dale Tooley, Dist. Atty., O. Otto Moore, Asst. Dist. Atty., Denver, for plaintiff-appellant.

No appearance for defendant-appellee.

LOHR, Justice.

The People appeal from a judgment of acquittal entered by the Denver District Court after a jury had been unable to reach a verdict on charges brought against the defendant, Robert Lee Franklin, for pimping, section 18–7–206, C.R.S.1973 (1978 Repl.Vol. 8) and conspiracy to commit pimping, section 18–2–201, C.R.S.1973 (1978 Repl.Vol. 8). The issue is whether the trial court erred in ruling that the testimony of two principal prosecution witnesses was incredible as a matter of law, with the result that the remaining evidence presented by the People was insufficient to support the submission of the case to the jury. We conclude that the ruling was erroneous and disapprove the district court's order granting the defendant's motion for a judgment of acquittal.[1]

I.

The direct criminal information states the pimping charge as follows:

... Between the dates of April 1, 1979, and May 10, 1979, at the City and County of Denver, State of Colorado, ROBERT LEE FRANKLIN and STEPHANIE J. O'CONNOR, did unlawfully, feloniously and knowingly live on and was supported and maintained in whole and in part by money and other thing of value earned, received, procured and realized by [JANE

---

1. As the prosecution acknowledges, constitutional protections against double jeopardy bar retrial of the defendant. *See U. S. Const.* amend. V; *Colo.Const.* Art. II, § 18.

DOE],[2] through prostitution; contrary to the form of the statute in such case made and provided, and against the peace and dignity of the People of the State of Colorado.

The conspiracy count alleges an agreement between the defendant and O'Connor to commit the crime of pimping during that same April 1 to May 10, 1979, period.

The defendant was tried separately. In his trial the principal witnesses for the prosecution were Doe and Deion Morvay, the owner of an escort service for which Doe worked for a short time during the period of the charged conspiracy. A summary of their testimony and of the evidence relied upon to impeach them is necessary to give context to the trial court's order granting a judgment of acquittal.

Doe testified to the following events. She met O'Connor and several other young women early in April 1979, and soon thereafter moved into a house occupied by them. O'Connor introduced Doe to Morvay and other persons at Elan's Photography on South Broadway Street in Denver, from which Morvay ran an escort service.[3] Doe began working for the escort service the very day she and O'Connor met.

Doe described the nature of Morvay's business and Doe's part in it. The escort service received telephone calls from potential customers. O'Connor wore a "beeper" by means of which she was advised when Morvay's business wished her to respond to a customer's call. When Doe's services were desired, O'Connor would take her to the place where she was to meet the customer. The men were required to pay $25 for the escort service fee, and the women bargained with them for additional payments as "tips" for various sexual acts. Under their arrangement with Morvay, the women kept the tips as their compensation. O'Connor always conducted the negotiations to set the amount of the tips for Doe's

services. Doe gave the escort service fees and all her tips—approximately $2,000 to $3,000—to O'Connor. O'Connor bought clothing and groceries for Doe.

Doe testified further that she met the defendant when he returned from out-of-town about two weeks after Doe moved into the house with O'Connor and the others. During this first meeting the defendant asked Doe if she was going to be "his lady" and she agreed. The defendant maintained a room in the house occupied by the women. He and O'Connor had a small child who also lived at the house. Doe saw the defendant at the house almost every other day and had sexual relations with him on occasion. Once, at O'Connor's direction, Doe slipped $500 under the defendant's door, and on another occasion she gave him $250 after he said to several of the women that "whoever got the most money at the end of the week gets a diamond." Both sums were earned by Doe through prostitution, her only employment during the relevant time period. Doe's activities led to her arrest on May 10, 1979.

Deion Morvay, the owner of the escort service operated out of Elan's Photography, testified as follows. Early in March of 1979 O'Connor came to her office with four other women and offered to work for Morvay's escort service. She hired them. The women were dispatched by the escort service in response to telephone calls from customers. The women collected the agency fees from the men, and were free to negotiate with them for tips for sexual services. The women kept the tips as their compensation. O'Connor usually handled all the arrangements for the women she brought to the service. O'Connor introduced Doe to Morvay and Morvay hired her.

Morvay testified that, when she complained to O'Connor that her girls did not respond to calls after agreeing to do so,

---

**2.** We elect to adopt a fictitious name for this girl, who was 14 years old during the relevant period.

**3.** Morvay ran numerous escort services under various names from the same business loca-

tion. The fact that more than one service was operated has no legal significance for the purpose of this opinion, and Morvay's businesses will be referred to collectively as her escort service.

O'Connor referred her to the defendant as the person who "handles things when there are rough spots." Morvay met with the defendant and explained the problem. He gave her $60 to $80 to cover the service fees for calls to which the women had failed to respond.

Morvay had advised O'Connor and Doe that Doe must obtain suitable identification before working for the escort service. Upon learning that Doe had worked at a large party without such identification, Morvay fired O'Connor and her women. Morvay testified that, after O'Connor and the other women were discharged, the defendant called and asked her to take them back. She related that conversation as follows:

Q: How did that happen?

A: Well, he called back and I said, "I am firing the girls," and I told him why, and he said—do you want me to tell you the whole story?

Q: Yes. Just what you said and what he said.

A: He said he liked my service; I had the best service, and the girls; the girls made a lot of money, and, you know, I was a good person to work for, and he wanted his girls to continue working for me and I said "no," and then he got rather nasty, and threatening, and I hung up on him.

Later, the defendant again talked to Morvay by telephone to try to persuade her to reemploy the women. Morvay testified about the conversation:

Q: What did he say?

A: Just the same thing, he wanted the girls to work, and he just got nasty, and threatening, and scary, and basically I kept slamming the phone on him, and pretty soon I had my phone changed.

Q: Did he say anything about the amount of money that was made through your service?

A: He said the girls were making a lot of money through my service, and it was a protective covering, more or less. They didn't have to go out on the street and it was better for all concerned if they worked in the service.

Q: Did you ever hire them back?

A: No. I didn't.

On May 16, 1979, the police executed a search warrant at Morvay's business and arrested her.

Among the evidence corroborating Doe's account of her prostitution activities was the testimony of two customers of the escort service who had engaged in acts of prostitution with her. Voluminous documentary evidence and testimony corroborated Morvay's description of her escort service business.

The defendant attempted to impeach Doe by showing that she had made statements inconsistent with her testimony at trial. He also sought to cast doubt on Morvay's testimony through her own acknowledgment that she agreed to be a witness as part of a plea bargain under which she would avoid imprisonment for a felony charge.

On direct examination Doe admitted that when first questioned after her arrest she had told the police she did not know the defendant. She explained this false response by saying that "Stephanie [O'Connor] said to never mention his name or that I knew him, because he would get into trouble." She also acknowledged giving the police a false identification card reflecting that she was an adult. O'Connor had told her to do that so that she could be bailed out of jail rather than taken to juvenile hall. On cross-examination Doe admitted she had not been candid during her questioning by the police or at the defendant's preliminary hearing in describing her relationship with him. She again accounted for her reticence and false statements by saying she was trying to protect the defendant. She also testified that, during the questioning by the police in juvenile hall in the presence of her father, embarrassment and a wish to protect the defendant caused her to deny a sexual relationship with him.

Doe further admitted lying to the defendant's investigator about her knowledge of the defendant's activities when the investigator appeared at the group home in which she had been placed and interviewed her in preparation for trial. The investigator also testified, contrary to Doe's initial statement at trial, that Doe told him during the interview that she had decided to testify in order to be released from juvenile hall.

Morvay testified during direct examination that she had been charged with "pimping and trafficking in children as a result of [her] activities" in running the escort service. She explained that she had entered a plea bargain with the district attorney whereby she would plead guilty to pimping and would testify against the defendant. In return she would be placed on probation for two years.[4] She was told by her attorney to expect a five-year jail sentence if the plea bargain was not made.

At the conclusion of the prosecution's case the defendant moved for a judgment of acquittal, which was denied. The motion was renewed at the conclusion of all the evidence, and the judge reserved ruling, awaiting the jury's verdict. After the jury had deliberated for more than a day, it reported that it was deadlocked. The judge discharged the jury. The defendant then requested a ruling on his motion for a judgment of acquittal, and the court granted that motion, saying:

> The Court in doing this is doing it based on the following factors: The testimony produced by the People in this case involved two witnesses; one, [Jane Doe]. [Jane Doe] gave several conflicting statements to the police; gave several statements, or at least a statement to an investigator that was different than those that had been previously given. The Court finds that testimony as unbelievable as a matter of law.
>
> The Court also in Deion Morvay's testimony is finding the same thing. The testimony given by Deion Morvay was highly suspect. She was allowed and the

Court is not being critical of the District Attorney in this matter, but she was allowed to enter into a deferred judgment where cases against her were dismissed, and the Court is finding that if the case were tried again I think that we could not find a jury that would reach a unanimous verdict on these cases, and for that reason the Motion to Dismiss if (sic) granted.

The propriety of this ruling is the question we now address.

## II.

◼ In ruling on a motion for a judgment of acquittal a trial court "must determine whether the evidence before the jury is sufficient in both quantity and quality to submit the issue of the defendant's guilt or innocence to the jury." *People v. Bennett,* 183 Colo. 125, 129, 515 P.2d 466, 468 (1973). "The issue before the trial judge is whether the relevant evidence, both direct and circumstantial, when viewed as a whole and in the light most favorable to the prosecution, is substantial and sufficient to support a conclusion by a reasonable mind that the defendant is guilty of the charge beyond a reasonable doubt." *Id.,* 183 Colo. at 130, 515 P.2d at 469. From the foregoing summary of testimony it is evident that if a jury were permitted to consider the testimony of Doe and Morvay there is ample evidence to satisfy the standard enunciated in *People v. Bennett, supra.* The question is whether in ruling that evidence to be incredible as a matter of law the trial judge failed in his duty to give full consideration to the right of the jury to determine the credibility of witnesses. *See People v. Waggoner,* 196 Colo. 578, 595 P.2d 217 (1979); *People v. Bennett, supra.*

◼ The determination of the credibility of witnesses is a matter solely within the province of the jury. Only when the testimony of a witness is "so palpably incredible and so totally unbelievable as to be rejected as a matter of law" can a court properly take this function from a jury. *People v.*

---

4. The written plea agreement was received in evidence. It reflects that Morvay was to plead guilty to pimping and receive a two year deferred judgment. Two other charges against her would then be dismissed. In return she was to testify truthfully and fully in the case against Franklin and O'Connor.

*Rivas*, 197 Colo. 131 at 136, 591 P.2d 83 at 86 (1979); *accord, e.g., People v. Gennings*, 196 Colo. 208, 583 P.2d 908 (1978); *People v. Martinez*, 187 Colo. 413, 531 P.2d 964 (1975); *compare* the present case with *People v. Urso*, 129 Colo. 292, 269 P.2d 709 (1954) (directed verdict for defendant sustained where the only evidence implicating the defendant was the testimony of a perpetrator of the crime who had given a conflicting prior statement under oath, was evasive on cross-examination, and gave testimony in conflict with that of nearly all other prosecution witnesses on less material matters). Inconsistencies in the testimony of a witness do not necessarily make the witness unworthy of belief; they are for the jury's consideration as bearing on credibility. *Miller v. People*, 141 Colo. 576, 349 P.2d 685 (1960), *cert. denied*, 364 U.S. 851, 81 S.Ct. 97, 5 L.Ed.2d 75 (1960). As we have previously stated, "It is rare, indeed, when a trial judge is justified in invading the province of the jury and substituting his judgment for that of the jury in determining critical issues bearing upon a defendant's guilt or innocence." *People v. Eaton*, 187 Colo. 379, 381–82, 531 P.2d 970, 971 (1975). While we are mindful that the trial judge had the opportunity to observe the witnesses, and was thus better positioned than we to evaluate their credibility, *see People v. Urso, supra*, the record in the instant case persuades us that the trial court erred in ruling that Doe and Morvay were unbelievable as a matter of law.

Witness Doe advanced plausible reasons for her pre-trial statements denying acquaintance with the defendant and, after acknowledging that she knew him, being less than candid about the extent of that knowledge and her relationship with him. Whether her testimony at trial implicating the defendant in criminal activity was worthy of belief or was a fabrication properly should have been resolved by a jury. Witness Morvay was shown to have a motive to testify in a manner supportive of the prosecution in order to assure that she would receive favorable treatment in her own criminal case. However, a jury should have been permitted to determine whether she was telling the truth about the defendant's

activities or had invented a tale to enhance her own prospects for freedom. The failure of one jury to reach a verdict on the charges brought against the defendant did not mean that a second jury would reach the same result. Indeed, the failure of the first jury to acquit the defendant is a strong indication that a reasonable person could believe the testimony of Doe and Morvay.

Issues of witness credibility often are at once difficult to resolve and essential to a determination of guilt or innocence. An important reason for entrusting determination of these critical issues to a jury is to obtain the benefit of the wisdom and diverse human experience of the several jurors in evaluating whether a witness is believable. Except in the most unusual situation it is for the jury and not the judge to decide these issues. *See People v. Waggoner, supra.*

We disapprove the order of the trial court granting the defendant's motion for a judgment of acquittal.