The PEOPLE of the State of Colorado,
Plaintiff-Appellant,

v.

James Dowell BRASSFIELD,
Defendant-Appellee.

No. 81SA388.

Supreme Court of Colorado,
En Banc.

Oct. 12, 1982.

Robert R. Gallagher, Jr., Dist. Atty., Catherine P. Richardson, Deputy Dist. Atty., Littleton, for plaintiff-appellant.

Miller & Leher, Martin P. Miller, Geraldine L. Allan, Littleton, for defendant-appellee.

QUINN, Justice.

The People appeal from a judgment of acquittal entered by the District Court of Arapahoe County after a jury had found the defendant, James Dowell Brassfield, guilty of two counts of felony menacing, section 18–3–206, C.R.S.1973 (1978 Repl. Vol. 8).[1] The trial court concluded that conflicts and contradictions within the prosecution's case rendered the evidence insufficient to support the jury verdicts and entered a judgment of acquittal notwithstanding the verdicts. Because we believe that the trial court applied an improper standard in entering the judgment of acquittal, we reverse the judgment and remand the case to the trial court for further proceedings.

I.

The defendant was charged in a two-count information with knowingly placing or attempting to place Thomas Biniasz and John Paglione in fear of serious bodily injury by the use of a deadly weapon, a pellet rifle, on March 8, 1980.[2] A summary of the trial evidence provides the objective context for our resolution of the issue before us.

At about 11:00 p.m. on March 8, 1980, Biniasz and Paglione, two teenage high school students, went to a pizza parlor located in a shopping center in Arapahoe County, Colorado. Biniasz was driving his 1969 blue GTO automobile and Paglione was riding as a passenger. As they entered the parking lot of the shopping center they encountered a blue Gremlin AMC automobile with out-of-state license plates. According to the teenagers' testimony, the driver of the Gremlin tried to "box them in" and, after derogatory gestures were exchanged between the occupants of both vehicles, the Gremlin was driven to another area of the parking lot. Thinking that he might know the occupants of the vehicle, Biniasz drove to approximately within 15 feet of it and parked. At this point one of the occupants of the Gremlin pointed a rifle out of the driver's window in the direction of Biniasz and Paglione. The teenagers immediately left the area and went to the pizza parlor where they called the police and gave them a description of the Gremlin vehicle and its license number.

At approximately 11:20 p.m. Officer Gerald Marques of the Cherry Hills Village Police Department stopped the Gremlin automobile. The defendant, who was wearing an orange coat, was driving the vehicle at this time and riding with him were two other passengers, Thomas Thorp and Carrie Tyra. Officer Marques made a visual examination of the inside of the vehicle and observed a "rifle type weapon" protruding from the left front or driver's seat.

---

1. Section 18–3–206, C.R.S. 1973 (1978 Repl. Vol. 8) provides:

 "A person commits the crime of menacing if, by any threat or physical action, he knowingly places or attempts to place another person in fear of imminent serious bodily injury. Menacing is a class 3 misdemeanor, but, if committed by the use of a deadly weapon, it is a class 5 felony."

2. The prosecution and the defense stipulated during trial that the pellet rifle was a deadly weapon.

After the teenagers had telephoned the police about the incident at the shopping center, Deputy Sheriff Dan Davis of the Arapahoe County Sheriff's Department picked up the young men and took them to the location where Officer Marques had stopped the Gremlin and its three occupants. Both teenagers made an on-the-scene identification of the defendant as the person who had been driving the Gremlin and who had pointed the weapon at them in the parking lot. Officer Davis seized the weapon from underneath the driver's seat of the vehicle. In the course of his investigation he observed that the defendant was wearing an orange coat.

During the trial Thomas Biniasz described the scene where the menacing took place and drew a diagram of the approximate location of the vehicles when the offense occurred. He also recounted how at the scene of the arrest he had identified the driver of the Gremlin as the man who had pointed the gun at him. Biniasz, however, was unable to make an in-court identification of the defendant as that person. The other teenager, John Paglione, did make an in-trial identification of the defendant as the perpetrator of the offense. His testimony on the issue of identification was as follows:

"Q When the rifle was pointing at you what were the lighting conditions in that parking lot?

A There was a light just—let's see, there was one here, there is also another light here. There are lights all over the parking lot and all of them were on.

Q It was fairly light?

A Yes, well lit.

Q Could you describe the driver of that vehicle?

A At the time he had a red—not red, an orange-ish down jacket on, and he had jeans on, with some sort of plaid flannel shirt.

Q Could you describe his hair?

A It was black and kind of frizzed out a little bit, and he had glasses on.

Q Is the person who was in that car and pointed the rifle at you that night in the courtroom?

A Yes.

Q Would you please describe where that person is seated and what they are wearing?

A Right over there.

Q At the table marked defendant?

A Yes.

Q And what is that person wearing?

A Blue jacket, just a suit.

Q A plaid jacket?

A Yes.

MR. MOODY [Deputy District Attorney]: Let the record reflect he has identified the defendant Mr. Brassfield."

\* \* \* \* \* \*

"Q . . . Did you see the same party that pointed the gun at you later that night?

A Yes.

Q Where was that?

A That was like University down by Greenwood Village.

Q And how did you get down to that location?

A We were escorted in a police car. We were in the back seat of it."

\* \* \* \* \* \*

"Q Did you point out any person at that location as being the person who pointed the gun at you?

A Yes, we did.

Q Is that the same person you have identified in the courtroom?

A Yes, it was."

At the conclusion of the prosecution's case the defendant moved for a judgment of acquittal. The trial court denied the motion primarily on the basis of Paglione's testimony which, according to the trial judge, positively identified the defendant as the person who had pointed the gun on the evening in question.

The defendant called as his only witness Carrie Tyra. She testified that she had been living with the defendant for over a year and that it was Tom Thorp, rather than the defendant, who pointed the gun at Biniasz and Paglione. Tyra also stated that Thorp was wearing the orange jacket on the evening in question and that, when the menacing occurred, he "picked up the gun which was under the passenger seat" and "put it across both me and Jim [Brassfield] and stuck it out Jim's window."

To rebut this testimony the prosecution called Tom Thorp. He testified that he and the defendant had been drinking the entire day of the incident, having consumed at least two cases of beer. He identified the pellet gun as belonging to the defendant and positively identified the defendant as the person who had pointed the gun at Biniasz and Paglione. Although Thorp acknowledged that he signed a written statement on December 19, 1980, at the Arapahoe County Sheriff's Office, in which he admitted to having pointed the pellet gun at the teenagers, he testified that the statement was untrue and was signed to assist the defendant. Thorp also admitted that he later signed an affidavit at the defense attorney's office, in which he confessed that he, rather than the defendant, pointed the gun on the evening in question. While on the witness stand, however, Thorp repudiated this statement as false and described how the defendant's father had promised to forgive him a debt in exchange for the statement exculpating the defendant. He also testified that the defendant told him that "he [the defendant] had already been charged with it, so if I said I did it it would just mess them up and they would drop it."

The jury returned guilty verdicts on each count. The defendant, who retained new counsel after the trial, filed motions for a judgment of acquittal and for a new trial. The motion for a new trial was primarily based upon two grounds: (1) newly discovered evidence, according to the defendant, pointed to Thorp as the person who pointed the weapon at the teenagers;[3] and (2) a new trial was required in the interest of justice. See Crim.P. 33(b). The court did not rule on the motion for a new trial, but, instead, granted the defendant's motion for a judgment of acquittal, ruling, in pertinent part, as follows:

"I think this is a case in which there has been a miscarriage of justice. I think that primarily because of the fact that the prosecution's witnesses contradicted each other, the evidence was highly conflicting and contradictory, and I can not feel comfortable with the conviction. I do not feel that the guilty verdict has been fully supported by competent and sufficient evidence in this case.

"The Court therefore finds that the evidence is insufficient and incompetent to support the verdict."

\* \* \* \* \* \*

"The verdict, therefore, is not received by the Court and the case is dismissed and the defendant's bond discharged. This procedure, of course, affords the prosecution an opportunity to appeal the Court's ruling and if the appellate court should determine that this Court is in error in setting aside the verdict this Court could be instructed by the appellate court to reinstate the jury verdict or to then consider the motion for new trial."

This appeal followed.

## II.

The People argue that the court misapprehended the appropriate standard for

---

**3.** The newly discovered evidence consisted of the following: a police photograph and other documents showing that Thorp wore glasses, and had a mustache and "kinky hair," thus indicating that he more closely resembled the teenagers' description of the person who pointed the gun at them; a Weld County Sheriff's Office property inventory showing that Thorp on January 14, 1981, when arrested, had a "burnt orange jacket" and a plaid shirt; an affidavit of Robert Duncan stating that he observed the arrest of the defendant on December 19, 1980, and that Thorp, rather than the defendant, was wearing an orange jacket at that time; and affidavits of two other persons, Carol Morris and Terry Brandhorst, stating that Thorp had told them that it was he, not the defendant, who had pointed the gun at the teenagers.

granting a judgment of acquittal and, in effect, invaded the province of the jury by assessing the credibility and weight to be accorded to the prosecution's evidence. We agree with the People's claim.

## A.

 To withstand a motion for a judgment of acquittal the prosecution has the burden of presenting evidence which, when viewed as a whole and in a light most favorable to the prosecution, is substantial and sufficient to support a conclusion by a reasonable person that the defendant is guilty of the crime beyond a reasonable doubt. *People v. Gomez,* 632 P.2d 586 (Colo. 1981), *cert. denied,* —— U.S. ——, 102 S.Ct. 1439, 71 L.Ed.2d 655 (1982); *People v. Elkhatib,* 632 P.2d 275 (Colo.1981); *People v. Bennett,* 183 Colo. 125, 515 P.2d 466 (1973). As this court observed in *People v. Downer,* 192 Colo. 264, 268–69, 557 P.2d 835, 838 (1976):

> "Only when the evidence is such that the jury must necessarily have a reasonable doubt should the judge direct a verdict in favor of the defendant. The trial court must give the prosecution the benefit of every reasonable inference which might be fairly drawn from the evidence. Finally, the trial court should not attempt to serve as a thirteenth juror or invade the province of the jury in determining the credibility of the witnesses and the weight to be given to various segments of the evidence."

*Accord, e.g., People v. Franklin,* 645 P.2d 1 (Colo.1982); *People v. Ray,* 626 P.2d 167 (Colo.1981); *People v. Roberts,* 197 Colo. 304, 592 P.2d 801 (1979); *People v. Martinez,* 191 Colo. 428, 553 P.2d 774 (1976). The limitation upon a judge's power to set aside a jury verdict is based, to a substantial degree, upon the fundamental tenet that it is the jury which should decide the difficult questions of witness credibility and the weight to be given to conflicting items of evidence. *People v. Franklin,* 645 P.2d at 5. Only when a witness' testimony is "palpably incredible and . . . totally unbelievable" may the court properly reject it as a matter of law. *Id.* at 4; *People v. Gennings,* 196 Colo. 208, 583 P.2d 908 (1978); *People v. Urso,* 129 Colo. 292, 269 P.2d 709 (1954). Even then, a judgment of acquittal would still be inappropriate if the remaining evidence, when appropriately viewed, is legally sufficient to support a finding of guilt by a reasonable person beyond a reasonable doubt. *E.g., People v. Franklin, supra.*

## B.

 Basically, the defendant's arguments to support the judgment of acquittal center on conflicts within the prosecution's case which, according to the defendant, create a reasonable doubt as a matter of law with respect to the identification of the defendant as the perpetrator of the crimes and also establish that it was physically impossible for the defendant to have pointed the gun in the manner described by Biniasz and Paglione. We find these arguments untenable.

In this case the prosecution witnesses Paglione and Thorp clearly identified the defendant as the person who menaced Biniasz and Paglione with the pellet gun. While Thorp's trial testimony conflicted with his earlier statement to the sheriff's office and with his affidavit to defense counsel, these inconsistencies and Thorp's explanation of them were for the jury to consider in determining what weight, if any, to give to his trial testimony. *People v. Franklin, supra; People v. Gennings, supra; People v. Martinez, supra.* The trial court did not find that this testimony was incredible as a matter of law, nor is such a contention supported by the record.

 Moreover, even without Thorp's testimony, the trial testimony of Paglione provides adequate support for the jury verdicts with respect to the contested issue of identification. The record shows that Paglione's identification of the defendant was unqualified and was corroborated by other evidence in the case. Officer Marques, for example, testified that the defendant had been driving the Gremlin vehicle when he stopped it on the road and that the defend-

ant was wearing an orange jacket at this time. Officer Davis also observed the orange jacket on the defendant at the scene of the arrest. This jacket matched the general description of the perpetrator's clothing offered by Paglione. Also, both police officers at the scene of the arrest observed the pellet gun inside that part of the vehicle occupied by the defendant when Officer Marques stopped it. In short, the evidence, when appropriately viewed, is sufficient to withstand a motion for a judgment of acquittal on the issue of identification.[4]

We also reject the defendant's assertion that it was physically impossible for him to have pointed the gun in the manner described by Biniasz and Paglione. The defendant's argument of physical impossibility centers on a diagram drawn by the witness Biniasz to depict the general location of the incident and the position of the vehicles at the time of the offense. The diagram, however, was not drawn to scale and was utilized primarily for illustrative purposes. Although the placement of the vehicle in the diagram is admittedly somewhat inconsistent with the description of the offense offered by Biniasz and Paglione, the diagram hardly amounts to a demonstration that it was physically impossible for the defendant to have pointed the weapon at the teenagers in the manner described by them. Rather, it was within the jury's prerogative to give primary significance to the teenagers' verbal testimony about the incident and to disregard entirely the illustrative drawing made by Biniasz.

■ It must be borne in mind that inconsistencies of this nature are not uncommon to the adversary process which, of necessity, must rely upon the sometimes contradictory and often incomplete testimony of human observers in attempting to reconstruct the historical facts underlying an event. It is because issues of credibility and weight are difficult to resolve and yet essential to the ultimate issue of guilt or innocence that the law entrusts these matters to the collective and diverse experience and judgment of the jury. *E.g., People v. Franklin, supra.* Internal inconsistencies within a witness' testimony and contradictions between witnesses on a particular fact do not, by themselves, justify usurping the traditional fact-finding function of the jury.

### C.

We conclude that there was substantial and sufficient evidence to support the jury's guilty verdict on both counts. The evidence was neither incredible as a matter of law on the issue of identification nor supportive of an irrefutable conclusion that it was physically impossible for the offenses to have taken place as described by the prosecution's witnesses. We are thus left with evidence which, while neither scientifically exact nor historically infallible, nevertheless is sufficient to permit a reasonable person to find the defendant guilty as charged. The trial court, under these circumstances, erred in setting aside the jury verdicts of guilty and entering a judgment of acquittal on the charges.

### III.

■ Our prior decisions have held that an appellate court, upon reversing a trial court's order granting a judgment of acquittal notwithstanding a jury verdict of guilty, may remand the case to the trial court with directions to reinstate the jury verdict without violating the constitutional prohibition against twice placing the defendant in jeopardy for the same offense. *People v. Rivas,* 197 Colo. 131, 591 P.2d 83 (1979); *People v. Dowdell,* 197 Colo. 76, 589

---

4. The defendant relies on various segments of testimony in support of his argument on the issue of identification. He contends, for example, that the descriptions given by Biniasz and Paglione correspond to Thorp rather than the defendant; that Biniasz testified that the person who pointed the gun was not in the courtroom; that Paglione's identification testimony was tentative in that it was largely in response to leading questions and contained evasive words such as "apparently;" that Tyra testified that Thorp was the person who pointed the gun; and that Thorp's testimony was incredible due to the conflicts between it and the other prosecution evidence and the fact that he had twice confessed to the crime. We have considered these segments of testimony as well as all other testimony in reaching our determination that there was sufficient evidence to support the jury verdicts.

P.2d 948 (1979); *People v. Gennings, supra.* While one of the primary purposes of the Double Jeopardy Clause, *U.S.Const.* Amend. V; *Colo.Const.* Art. II, Sec. 18, is to prevent a successive trial on the issue of guilt or innocence after this ultimate factual issue has previously been determined in the defendant's favor at a former prosecution, see, e.g., *Sanabria v. United States,* 437 U.S. 54, 98 S.Ct. 2170, 57 L.Ed.2d 43 (1978); *Brown v. Ohio,* 432 U.S. 161, 97 S.Ct. 2221, 53 L.Ed.2d 187 (1978); *United States v. Wilson,* 420 U.S. 332, 95 S.Ct. 1013, 43 L.Ed.2d 232 (1975); *People v. Williams,* 651 P.2d 899 (Colo.1982), the entry of a judgment of conviction upon a jury verdict already returned does not require the successive trial that the Double Jeopardy Clause was designed to prevent.[5]

Although we are reversing the judgment of acquittal in this case, we do not order that a judgment of conviction automatically be entered on the jury verdicts. Our reversal of the judgment of acquittal places this case in the same procedural state it would have been in had the judgment of acquittal never been entered, namely, a case awaiting the court's ruling on a motion for a new trial after the return of jury verdicts based upon legally sufficient evidence. The appropriate procedure under these circumstances is to remand the case to the trial court for a ruling upon the defendant's motion for a new trial upon the grounds of "newly discovered evidence" and "the interest of justice," Crim.P. 33(b), both of which are unrelated to the legal sufficiency of the evidence underlying the jury verdicts of guilty. If the trial court upon remand denies the motion for a new trial, then it may and should enter a judgment of conviction on the jury verdicts. If, on the other hand, the court grants the defendant's motion for a new trial, then the defendant may be tried again consistently with the Double Jeopardy Clause. *See United States v. Tateo,* 377 U.S. 463, 84 S.Ct. 1587, 12 L.Ed.2d 448 (1964); *United States v. Ball,* 163 U.S. 662, 16 S.Ct. 1192, 41 L.Ed. 300 (1896); *White v. District Court,* 180 Colo. 147, 503 P.2d 340 (1972).

Because the trial court improperly granted the defendant's motion for a judgment of acquittal on both counts after the jury's verdicts of guilty, we reverse the judgment of acquittal and remand the case to the trial court for further proceedings consistent with the views herein expressed.

LEE, J., does not participate.

---

**5.** In *Burks v. United States,* 437 U.S. 1, 98 S.Ct. 2141, 57 L.Ed.2d 1 (1978), the Supreme Court held that the Double Jeopardy Clause prohibits a retrial where an appellate court reverses a conviction solely for lack of sufficient evidence to sustain the jury's verdict. The Court in *Burks* equated an appellate reversal for insufficient evidence as tantamount to an acquittal, since the reversal constitutes a decision that the government has failed to prove its case. A retrial under such circumstances would permit the prosecution a second opportunity to supply evidence which it failed to muster in the first proceeding. However, an appellate reversal of a judgment of acquittal entered after a jury verdict of guilty does not constitute a decision that the prosecution has failed to prove its case in the first trial. Nor does reinstatement of the jury verdict of guilty in such a case require a retrial of factual issues already resolved by the jury in the first trial upon the basis of legally sufficient evidence of guilt. Thus, the constitutional interest protecting an accused against

retrial *due to evidentiary insufficiency* in a former prosecution is not implicated by the reinstatement of the jury verdict of guilty. *Cf., e.g., Tibbs v. Florida,* — U.S. —, 102 S.Ct. 2211, 72 L.Ed.2d 652 (1982) (retrial not barred under double jeopardy when state appellate court sets aside conviction on ground that jury verdict was against the weight, as distinguished from sufficiency, of the evidence); *United States v. Scott,* 437 U.S. 82, 98 S.Ct. 2187, 57 L.Ed.2d 65 (1978) (retrial not barred by double jeopardy following the granting of a defendant's dismissal motion made at close of all the evidence and on grounds unrelated to factual guilty or innocence); *United States v. Wilson,* 420 U.S. 332, 95 S.Ct. 1013, 43 L.Ed.2d 232 (1975) (government not prohibited from appealing order of dismissal due to preindictment delay, after jury already had returned verdict of guilty; disposition of dismissal order could be made without subjecting defendant to a second trial at government's behest).