23CA1311 Peo in Interest of AR 10-23-2025

COLORADO COURT OF APPEALS

---

Court of Appeals No. 23CA1311
City and County of Denver Juvenile Court No. 22JD456
Honorable D. Brett Woods, Judge

---

The People of the State of Colorado,

Petitioner-Appellee,

In the Interest of A.R.,

Juvenile-Appellant.

---

JUDGMENT AFFIRMED

Division IV
Opinion by JUDGE SCHOCK
Harris and Johnson, JJ., concur

**NOT PUBLISHED PURSUANT TO C.A.R. 35(e)**
Announced October 23, 2025

---

Philip J. Weiser, Attorney General, Jacob R. Lofgren, Senior Assistant Attorney General, Denver, Colorado, for Petitioner-Appellee

Megan A. Ring, Colorado State Public Defender, Madeline Dobkin, Deputy State Public Defender, Denver, Colorado, for Juvenile-Appellant

¶ 1   A.R., a juvenile, appeals his adjudication of delinquency for menacing by use of a firearm.  He argues that (1) the evidence was insufficient to support the adjudication; (2) the juvenile court abused its discretion by denying his request for a jury trial; and (3) the juvenile court improperly shifted the burden of proof with a comment it made during closing argument.  He also contends that the cumulative effect of these errors requires reversal.  We affirm.

I.  Background

¶ 2   A.R. and his friend, D.B., were at the mall when they saw D.B.'s ex-girlfriend, J.M., and her friend, S.S.  D.B. had cut off communication with J.M. about a month earlier, and seeing him made J.M. feel uncomfortable.  When J.M. and S.S. walked into another store across the street, A.R. and D.B. — parked three spaces from J.M.'s car — followed, prompting J.M. and S.S to leave.

¶ 3   According to J.M., as she was backing out of her parking space, A.R. and D.B. sprinted back to their car and began following her, with D.B. driving and A.R. in the passenger seat.  D.B. was driving "erratically" and pulled within "an inch" of her car.

¶ 4   After seven or eight blocks, the two cars stopped at a red light.  J.M. told S.S., who was in the passenger seat, to lay back her seat

1

because A.R. and D.B. were "carrying." J.M. then looked over her shoulder and saw A.R.'s arm "out of the window holding a pistol." When the light turned green, J.M. "sped off to try to lose them." She then got into a turning lane and slammed on her brakes, and D.B. and A.R. drove away. J.M. reported the incident to police, and A.R. was charged with menacing by use of a firearm.

¶ 5     At trial, J.M. testified to this account. On cross-examination, defense counsel highlighted several inconsistencies between J.M.'s trial testimony and her prior statements to police. For example, while J.M. testified that she saw the gun first and S.S. did not say anything about it, she previously told police that S.S. first told her A.R. had a gun and she only looked and saw the gun after that. Defense counsel also pointed out inconsistencies in J.M.'s accounts regarding, among other things, (1) the nature of her communication with A.R. and D.B. in the parking lot; (2) whether A.R. had waved the gun out the window as they were driving; (3) how A.R. was positioned; (4) how long A.R. and D.B. followed her; and (5) the speed D.B. was driving. Testifying officers also acknowledged inconsistencies between J.M.'s and S.S.'s statements to police.

¶ 6    S.S. testified at trial that when J.M. told her to "get down" because A.R. and D.B. "mess with guns," she "freaked out" and got down on the floorboard.  J.M. then "started screaming that she saw a gun," turned into a parking lot and started "screaming and crying and throwing up and freaking out."  But S.S. never saw a gun and did not see A.R. do anything threatening.  D.B. likewise testified that A.R. did not have a gun or threaten J.M.  And aside from J.M., no one else reported seeing a gun or erratic driving.

¶ 7    After a bench trial, the juvenile court adjudicated A.R. delinquent as charged.  It noted the discrepancy between J.M.'s testimony that she saw A.R. holding a gun and D.B.'s testimony that he did not, but it found J.M. to be more credible based on her demeanor and D.B.'s friendship with A.R.  The court also found that although S.S. did not see a gun (because her view was "necessarily at least somewhat obstructed"), her testimony about J.M.'s reaction to seeing the gun was persuasive and corroborative.

¶ 8    A.R. moved for a new trial on the ground that the evidence did not establish beyond a reasonable doubt that A.R. had a gun.  The motion pointed to claimed weaknesses and inconsistencies in J.M.'s

3

testimony and argued that the juvenile court's credibility findings were "unreasonable." The juvenile court denied the motion.

## II. Sufficiency of the Evidence

¶ 9 A.R. first argues that the evidence was insufficient to support his adjudication because (1) J.M.'s testimony was incredible as a matter of law; and (2) even if it was not, that testimony was not alone sufficient to prove A.R.'s guilt beyond a reasonable doubt when considered in light of the other testimony. We disagree.[1]

### A. Standard of Review and Applicable Law

¶ 10 Our review of the sufficiency of the evidence in a juvenile delinquency case is the same as it is in a criminal case. *People in Interest of J.R.*, 216 P.3d 1220, 1221 (Colo. App. 2009). We review the record de novo to determine "whether the relevant evidence, both direct and circumstantial, when viewed as a whole and in the light most favorable to the prosecution, is substantial and sufficient both in quantity and quality to support a conclusion by a

---

[1] A.R. points out that the juvenile court judge in this case later resigned and was disciplined for misconduct that included being under the influence of alcohol while at work. *See In re Woods*, 2024 CO 72, ¶¶ 5, 10. But although A.R. highlights various perceived irregularities in the proceedings, he does not assert any claim of error related to the juvenile court judge's misconduct.

reasonable mind that the [juvenile] is guilty of the charge beyond a reasonable doubt." *People in Interest of B.D.*, 2020 CO 87, ¶ 8.

¶ 11    We do not assess the credibility of witnesses or resolve conflicts or inconsistencies in the evidence. *People in Interest of K.D.W.*, 2020 COA 110, ¶ 38. Nor may we set aside an adjudication "merely because we might have drawn a different conclusion had we been the trier of fact." *Id.* Instead, we ask only whether "any rational trier of fact could accept the evidence . . . as sufficient to support a finding of guilt beyond a reasonable doubt." *Id.*; *see also People v. Tomaske*, 2022 COA 52, ¶ 32 ("[S]ufficiency challenges after a bench trial are no different than those after a jury trial.").

¶ 12    As relevant in this case, a person commits felony menacing if, "by any threat or physical action, he or she knowingly places or attempts to place another person in fear of imminent serious bodily injury . . . by the use of a firearm." § 18-3-206, C.R.S. 2025.

### B.    Incredible as a Matter of Law

¶ 13    We first reject A.R.'s contention that we must disregard J.M's testimony because it is incredible as a matter of law.

¶ 14    Testimony is incredible as a matter of law when it "conflicts with nature or fully established facts" — for example, when a

5

witness "describes events she could not possibly have seen or that are not possible under the laws of nature." *People v. Minjarez*, 81 P.3d 348, 355 (Colo. 2003). But testimony that is "merely biased, conflicting, or inconsistent is not incredible as a matter of law." *Id.*

¶ 15    Seizing on a four-question exchange during J.M.'s cross-examination, A.R. asserts that J.M.'s account of the car chase was physically impossible because she told police that D.B. followed her for seven blocks at a speed of 80 to 100 miles per hour while she went the speed limit. But the thrust of J.M.'s testimony was that D.B. was driving fast and erratically, not his precise speed. *Cf. People v. Brassfield*, 652 P.2d 588, 593 (Colo. 1982) (rejecting the defendant's argument of physical impossibility based on illustrative diagram); *State v. Hornsby*, 858 S.W.2d 892, 895 (Tenn. 1993) (noting that the "physical facts rule" does not apply to "assumptions or calculations based upon estimates as to speed, distance, time, and other such uncertain matters in the movement of vehicles" (citation omitted)). Indeed, J.M. did not mention D.B.'s speed at all on direct and, on cross, initially estimated the speed to be "[a]bout 65 miles an hour" before being impeached with her prior statement.

6

¶ 16     Moreover, the speed of D.B.'s car was ancillary to the main point — that A.R. had a gun.  Even if J.M. was "grossly inaccurate or confused" about the speed of the cars, it was not "physically impossible" for A.R. to have threatened her with a gun as she described.  *People v. Ramirez*, 30 P.3d 807, 810 (Colo. App. 2001); *see also People v. Kessler*, 2018 COA 60, ¶ 12 ("[A] fact finder is not required to accept or reject a witness's testimony in its entirety; it may believe all, part, or none of a witness's testimony. . . .").

¶ 17     A.R. also asserts that J.M.'s testimony on cross-examination that S.S. saw the gun first was contrary to undisputed facts.  But again, J.M. acceded to this account only when confronted with her prior statement.  Her testimony on direct (and initially on cross) was that *she* saw the gun first.  To the extent J.M.'s statements were in conflict on this point, the fact was not "fully established."  *Minjarez*, 81 P.3d at 355.  And if anything, the parties' agreement in closing argument that S.S. did *not* see a gun was consistent with J.M.'s original testimony.  That testimony was not rendered incredible as a matter of law just because J.M. later testified inconsistently with it.  *See id.*; *see also People v. Dash*, 104 P.3d 286, 289 (Colo. App. 2004) ("Inconsistencies in testimony and admitted lies will

undoubtedly be considered by a jury in determining the credibility and weight of the evidence" but do not make the testimony "so palpably incredible and totally unbelievable that we must reject it outright."); *Brassfield*, 652 P.2d at 593 ("Internal inconsistencies within a witness'[s] testimony . . . do not, by themselves, justify usurping the traditional fact-finding function of the jury.").

### C. Evidence Supporting Adjudication

¶ 18 Our conclusion that J.M.'s testimony cannot be disregarded as incredible as a matter of law leads us to conclude that the evidence was sufficient to support the juvenile court's adjudication.

¶ 19 J.M. testified that she saw A.R. holding a black pistol out of the window of D.B.'s car with an "intimidating" demeanor. She testified that she was "very scared . . . major fight or flight" and "felt that [she] had to save [herself] and [S.S.]" Moreover, S.S. testified that J.M. screamed that she saw a gun and then sped off, pulled into a parking lot, and started "freaking out." Viewed in the light most favorable to the prosecution, this evidence — eyewitness testimony from the victim, corroborated by a contemporaneous outburst — was sufficient to support a finding beyond a reasonable

doubt that A.R. had a gun and knowingly placed J.M. in fear of imminent serious bodily injury with it.  *See B.D.*, ¶ 8; § 18-3-206.

¶ 20    A.R.'s arguments to the contrary are little more than a request that we reweigh the evidence and make our own credibility determinations.  He argues that the juvenile court unreasonably overlooked inconsistencies in J.M.'s testimony, misjudged D.B.'s and J.M.'s credibility, and dismissed S.S.'s testimony that she did not see a gun because her view was obstructed.  But we may not second-guess the juvenile court's assessment of the evidence or "set aside a verdict merely because we might have drawn a different conclusion had we been the trier of fact."  *K.D.W.*, ¶ 38.

¶ 21    It is true that defense counsel's cross-examination was effective in eliciting some inconsistencies between J.M.'s testimony and her prior statements (though not on the critical point that she saw A.R. with a gun).  It is also true that D.B.'s friendship with A.R. did not necessarily mean he was not credible (though it could have). *See Merritt v. People*, 842 P.2d 162, 167 (Colo. 1992) (defining "bias" as a "relationship between a party and a witness which might lead the witness to slant, unconsciously or otherwise, his testimony in favor of or against a party" (citation omitted)).  And it is possible

that S.S. could have seen the gun from the floorboard (though she said all she could see were trees, streetlights, and the sky).[2] But these were all questions for the juvenile court, which resolved them in favor of J.M.'s account. We may not substitute our judgment. *See People v. Sharp*, 104 P.3d 252, 256 (Colo. App. 2004).

¶ 22    A.R. also contends that J.M.'s testimony was insufficient because it was not corroborated by other evidence. But the victim's eyewitness testimony does not require independent corroboration to sustain an adjudication. J.M.'s testimony alone was sufficient, even if there was also evidence pointing in the other direction. *See Ramirez*, 30 P.3d at 809-10; *see also People v. LaRosa*, 2013 CO 2, ¶ 2 ("[T]he sufficiency of the evidence test . . . requires no corroborating evidence."). A.R.'s citations to the rules regarding the sufficiency of a defendant's confession, *see LaRosa*, ¶ 41, and the admission of child hearsay, *see* § 13-25-129, C.R.S. 2025, are inapposite. In any event, there *was* corroboration for J.M.'s testimony — S.S.'s report of J.M.'s contemporaneous reaction.

---

[2] S.S.'s testimony that she saw A.R. doing "nothing" referred to when she was in the seat *before* she got onto the floorboard.

¶ 23     We acknowledge that, in denying A.R.'s motion for a new trial, the juvenile court gave a confusing explanation that seemed to contradict its prior finding that J.M. saw the gun.  It said:

> I understand that this was kind of a circumstantial evidence case where . . . the victim didn't see the person pointing the gun at them.
>
> But the law makes no difference between direct and circumstantial evidence. . . .  And . . . I thought that the testimony fell under the excited utterance exception to the hearsay rule.

It is unclear whether the court misspoke or misremembered the evidence and its prior findings.  But regardless, we are reviewing the sufficiency of *the evidence* presented at trial, not the juvenile court's explanation for denying the motion for a new trial.  And whatever the court meant in denying the motion for new trial, J.M. *did* testify that she saw A.R. holding a gun and, in its original ruling at trial, the juvenile court credited that testimony.

III.    Denial of Request for Jury Trial

¶ 24     A.R. next argues that the juvenile court abused its discretion by denying his request for a jury trial.  We are not persuaded.

11

## A. Additional Background

¶ 25    A.R. requested a jury trial on the menacing charge under section 19-2.5-610(1), C.R.S. 2025.  He acknowledged that a jury trial was not mandatory, but he argued that the court should exercise its discretion to grant one because he was "facing serious charges which carry potentially life-altering consequences."  He also asserted that the court's pretrial exposure to certain evidence in the case risked influencing its assessment of the facts at trial.  The prosecution did not object, saying it would "defer to the [c]ourt."

¶ 26    The court denied A.R.'s request.  It first noted that "in the statute[,] there is no standard for the [c]ourt to apply when a discretionary trial should be granted."  It then explained:

> [W]hat I have said in the past is — and it's not the greatest legal analysis, but when the case sort of seems like to be more of an old case, let's say the juvenile is 17 or 17 and a half, about to be 18, the crime is serious like sex assault, which is not to say that felony menacing isn't serious, it's serious; but when it has those indicia of what would be, but for a few months, an adult case, then I would grant a discretionary jury trial.  I don't have that here.

¶ 27    After clarifying that A.R. was fifteen years old at the time of the alleged offense, the court said that "for those reasons, [it was] not

12

going to grant a discretionary jury trial." The court also reasoned that a jury trial was not warranted because it had not "heard a lot of the facts of this case," and "in that sense [it was] a blank slate."

### B. Applicable Law and Standard of Review

¶ 28 There is no constitutional right to a jury trial in a juvenile delinquency proceeding. *A.C. v. People*, 16 P.3d 240, 243 (Colo. 2001). A juvenile has a statutory right to a jury trial in only two circumstances — when the juvenile is charged as an aggravated juvenile offender or with a crime of violence — neither of which applies in this case. *See* § 19-2.5-610(1); *A.C.*, 16 P.3d at 243.

¶ 29 For other felonies, the juvenile court "has discretion to grant a jury trial," and its refusal to do so "does not constitute error." *A.C.*, 16 P.3d at 243; *see People in Interest of A.B.-B.*, 215 P.3d 1205, 1207 (Colo. App. 2009). This discretion allows the court to "balance the benefits of informal, speedy and rehabilitative proceedings against the severity of the offense, the nature of the consequences and the particular facts of the case." *A.C.*, 16 P.3d at 244.

¶ 30 We review a ruling on a juvenile's request for a jury trial in a delinquency proceeding for an abuse of discretion. *A-B.B.*, 215 P.3d at 1209. We will not disturb the juvenile court's decision unless it

was "manifestly arbitrary, unreasonable, or unfair." *Id.* (citation omitted). The question is not "whether we would have reached a different result but, rather, whether the [juvenile] court's decision fell within a range of reasonable options." *People in Interest of T.B.*, 2016 COA 151M, ¶ 60 (citation omitted), *aff'd*, 2019 CO 53.

## C.  Analysis

¶ 31    A.R. contends that the juvenile court misunderstood the law by (1) saying that section 19-2.5-610(1) does not set forth a legal standard and (2) applying a "one-size-fits-all approach" that did not take into account the relevant factors. We disagree on both points.

¶ 32    First, the juvenile court was correct that there is no legal standard for granting a discretionary jury trial in section 19-2.5-610(1). That statute says only that the court "may order" a jury trial. *Id.* And while *A.C.* specified that the statute gives the court discretion to "balance the benefits of informal, speedy and rehabilitative proceedings against the severity of the offense, the nature of the consequences and the particular facts of the case," nothing requires the court to expressly address each of those considerations. 16 P.3d at 244; *see T.B.*, ¶ 61 (affirming juvenile court's denial of motion for jury trial without factual findings).

14

¶ 33    Second, the court explained its decision by reference to the circumstances of this case: (1) the charge was not the most serious offense; (2) the juvenile was only fifteen years old; and (3) it had not yet heard substantial evidence.  Those were reasonable factors for the court to consider.  *See A.C.* 16 P.3d at 241-43; *cf. Bostelman v. People*, 162 P.3d 686, 693 (Colo. 2007) (noting that "the age at which a juvenile commits the delinquent act is the determinative statutory factor" in whether the juvenile can be charged as an adult).  The court's general practice of granting a jury trial when the crime is serious and the juvenile is close to adulthood — and its jury trial guarantee — did not make those reasons manifestly arbitrary, unreasonable, or unfair.  *See A-B.B.*, 215 P.3d at 1209.

¶ 34    A.R. takes issue with *how* the court balanced the relevant factors.  In particular, he asserts that a jury trial would not have caused significant delay, that the allegations were serious, and that the consequences of the adjudication were severe.  But our role is limited to determining whether the juvenile court's decision "fell within a range of reasonable options."  *T.B.,* ¶ 60 (citation omitted).  And the denial of a jury trial may be a reasonable option, even when the charge is serious and the consequences are severe.  *Id.* at ¶ 63

15

(affirming denial of jury trial on two counts of sexual exploitation of a child despite the requirement that the juvenile register as a sex offender and the social stigma associated with the adjudication).

¶ 35    A.R. also argues that a jury was necessary because the juvenile court (1) prejudged J.M.'s credibility by denying the motion to suppress her out-of-court photograph identification of A.R. and (2) heard inadmissible evidence about A.R.'s firearm charges in another case.  But as the court noted, J.M. did not testify at the pretrial hearing, so the court had no opportunity to judge her credibility.  The court's conclusion that J.M.'s *identification* of A.R. — someone she knew — was sufficiently reliable does not mean it had credited her account of what A.R. did.  *See Bernal v. People*, 44 P.3d 184, 192 (Colo. 2002) (holding that an out-of-court identification is admissible if "the totality of the circumstances does not indicate a very substantial likelihood of irreparable misidentification").  And to the extent the court heard inadmissible evidence, it is presumed to have disregarded it, as the court explicitly said it would do.  *See People v. Hall*, 2021 CO 71M, ¶ 36.

¶ 36    Beyond that, A.R. asserts that the juvenile court could not be impartial because it asked the parties at the pretrial hearing if a

plea agreement was still on the table. But the court did not participate in the plea discussions, *see* § 16-7-302(1), C.R.S. 2025; order the parties to engage in such discussions, *see People v. Justice*, 2023 CO 9, ¶ 21; or "indicate a preference for a plea disposition rather than a trial," *Crumb v. People*, 230 P.3d 726, 732 (Colo. 2010). It simply asked about the plea status and directed the parties to apprise the court of any resolution. *See id.* at 731 ("A judge may make observations about the evolving legal posture of a case and may inquire as to whether parties wish to consummate a plea agreement."). Read in context, the court's comment that a resolution would give it a day to "maybe get back and do something else" was just making the point that prompt notification would allow it to adjust its schedule accordingly. That exchange did not undermine the court's impartiality so as to mandate a jury trial.

¶ 37    Thus, because the denial of A.R.'s request for a jury trial "fell within a range of reasonable options" under the circumstances of this case, the juvenile court did not abuse its discretion. *T.B.*, ¶ 61.

## IV.   Question During Closing Argument

¶ 38    A.R. finally contends that the juvenile court shifted the burden of proof to him when it asked his counsel during closing argument

17

how it could "get around" S.S.'s testimony that J.M. "freaked out" and "started screaming that she saw a gun." We again disagree.

¶ 39    The question at issue came as defense counsel highlighted S.S.'s testimony that she did not see a gun. The court interjected:

> Well, I guess what I'm stuck on, and I — is [S.S.] testified just a few minutes ago that [J.M.] freaked out while she was on the floorboard, started screaming that she saw a gun, and that she was throwing up and crying.
>
> . . . .
>
> How do I get around that for your client?

¶ 40    Defense counsel responded: "[W]e're not getting around anything. This is a reasonable doubt . . . standard, and there's plenty of reasonable doubt here." He went on to argue that, when S.S. was on the floorboard, she could still see A.R. not "doing anything," and he attributed J.M.'s outburst to a panic attack.

### A.    Applicable Law and Standard of Review

¶ 41    The prosecution bears the burden of proving the guilt of the accused beyond a reasonable doubt. *Tibbels v. People*, 2022 CO 1, ¶¶ 23-24. That burden never shifts: The accused must never be required to prove anything. *People v. Santana*, 255 P.3d 1126,

18

1130 (Colo. 2011). Thus, comments that shift or lower the prosecution's burden of proof require reversal. *Tibbels*, ¶ 22.

¶ 42 But subject to this and other constitutional limitations, the court has broad discretion in a bench trial to ask questions it deems necessary to "assess the evidence and discover the truth." *Hall*, ¶ 23. In performing this function, the court may solicit argument from the parties regarding admitted evidence. *Id.* at ¶ 29.

¶ 43 We review de novo whether the juvenile court shifted the prosecution's burden of proof. *Tibbels*, ¶ 22. We otherwise review the court's comments for an abuse of discretion. *Hall*, ¶ 16.

### B. Analysis

¶ 44 The juvenile court's comment did not shift the burden of proof, much less indicate that the court failed to hold the prosecution to its burden of proof beyond a reasonable doubt. *See People v. Abu-Nantambu-El*, 2017 COA 154, ¶ 30 ("[T]he trial court is presumed to know and follow the law." (citation omitted)), *aff'd*, 2019 CO 106.

¶ 45 Contrary to A.R.'s characterization, the juvenile court did not require A.R. to prove anything. Instead, it highlighted what it apparently believed to be strong evidence of A.R.'s guilt and gave defense counsel an "opportunity to advance argument" about why

19

that evidence did not satisfy *the prosecution's* burden. *Hall,* ¶ 31. In other words, before finding A.R. delinquent, the court gave defense counsel a "meaningful opportunity to respond" to its assessment of the evidence. *Id.* at ¶ 32. The court could have just ruled as its question foreshadowed it would. By giving defense counsel one last chance to dissuade it of that result, the court did not shift the burden or otherwise abuse its discretion. *See id.* Nor did it violate the presumption of innocence. *See id.* at ¶ 38.

## V. Cumulative Error

¶ 46 Because we have not identified any error, A.R.'s cumulative error argument fails as well. *See Howard-Walker v. People,* 2019 CO 69, ¶ 25 ("For reversal to occur based on cumulative error, a reviewing court must identify multiple errors that collectively prejudice the substantial rights of the defendant . . . .").

## VI. Disposition

¶ 47 The judgment is affirmed.

JUDGE HARRIS and JUDGE JOHNSON concur.