The PEOPLE of the State of Colorado,
Plaintiff–Appellant,

v.

Charles CLEBURN, Defendant–Appellee.

No. 88SA382.

Supreme Court of Colorado,
En Banc.

Nov. 20, 1989.

Roger B. Larsen, Dist. Atty., and Steven B. Rich, Chief Deputy Dist. Atty., Canon City, for plaintiff-appellant.

No appearance for defendant-appellee.

Justice LOHR delivered the Opinion of the Court.

The prosecution has filed this interlocutory appeal pursuant to C.A.R. 4.1 challenging an order of the Fremont County District Court suppressing a rifle and statements made by the defendant to a deputy sheriff. The trial court concluded that the statements had been made during a custodial interrogation without the required reading of *Miranda*[1] warnings and were involuntary. The trial court also ruled that the rifle had been seized after a warrantless search conducted without the voluntary consent of the defendant. We affirm the trial court's ruling and remand the case for further proceedings.

I.

The essential facts are not in dispute.[2] At approximately 5:00 p.m. on September 7, 1988, Deputy Sheriff Don Alder went to a location in western Fremont County to investigate a report that someone had menaced another person with a rifle and had fired the rifle at the victim. Alder spoke with the victim, who described the person who had menaced him. From the description, Alder determined that the defendant, Charles Cleburn, was a likely suspect. Alder, together with posseman Dan Ogden,[3] went to Cleburn's residence, which was in a sparsely populated area.

At approximately 7:00 p.m. Alder and Ogden arrived at Cleburn's house. Both were armed and dressed in uniforms. Alder was a previous acquaintance of Cleburn and the two were on friendly terms. The trial court described what followed as "sort of a 'good ol' boy' scenario." Alder knocked at Cleburn's door, and told him that he needed to talk to him, and Cleburn told Alder and Ogden to "come on in." The three men, along with Cleburn's wife, spoke in Cleburn's kitchen. Alder addressed Cleburn by his nickname, "Bo," and asked if he had experienced a "run-in with a young kid" that afternoon. Cleburn said "yes." Alder said that the youngster had reported that "there was a weapon" and asked Cleburn if he had used any sort of a weapon. Cleburn's wife replied that Cleburn had a BB gun, and Cleburn pointed to such a gun leaning against a wall of the kitchen.

Alder then asked Cleburn a series of questions about any other guns he might own, inquiring first about a hunting rifle. Cleburn admitted owning a .270 rifle and went to his bedroom to get it. Alder followed Cleburn into his bedroom and Cleburn showed Alder the .270 rifle, which Cleburn had retrieved from a walk-in closet. In response to further questions by the deputy, Cleburn produced two shotguns and a .22 rifle from the closet. Alder then told Cleburn that the victim had mentioned a lever-action rifle, and Alder asked Cleburn if he had "something like that, like a .30–.30." Cleburn admitted having such a gun. Alder asked if he could see it, but said "you don't have to let me." Cleburn showed him the rifle. Alder then asked if he could look in the closet to see if there were any other guns, again telling Cleburn that he did not have to let him. Cleburn agreed to the inspection, and the deputy examined the closet. Satisfied that there

---

1. *Miranda v. Arizona*, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966).

2. The evidence was presented by a single witness, Fremont County Deputy Sheriff Don Alder, who was called by the prosecution. The following facts are taken from the trial court's ruling, supplemented to some extent by Alder's uncontradicted testimony.

3. The record does not specifically disclose whether the "posseman" was a law enforcement officer. The trial court observed that the posseman was "the same thing" as a deputy sheriff. The prosecution has not taken issue with this, so we consider both Alder and Ogden to be law enforcement officers and sometimes refer to them both as deputies.

were no other guns in the closet, Alder asked if he could take the .30–.30 with him, and Cleburn agreed.

Alder then returned to his car with the rifle and "got to thinking a little bit." Shortly thereafter he went back to Cleburn's door, asked Cleburn to come outside and placed him under arrest. Cleburn was subsequently charged in the District Court for Fremont County with one count of menacing by the use of a deadly weapon, § 18–3–206, 8B C.R.S. (1986), a class 5 felony.

In a pretrial ruling, the trial court granted a motion by the defendant to suppress the statements made by Cleburn to Alder prior to the formal arrest on the grounds that they were made during custodial interrogation without the benefit of a *Miranda* advisement and were involuntary. The trial court also suppressed the .30–.30 rifle seized by Alder on the grounds that the rifle was discovered as a product of the illegal custodial interrogation and that Cleburn had not voluntarily consented to the search. The prosecution then brought this interlocutory appeal.

## II.

First, we must consider whether Cleburn's statements should have been suppressed. An advisement of rights pursuant to *Miranda v. Arizona*, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966), is required before an individual in police custody may be subjected to interrogation by law enforcement officers. *People v. Sandoval*, 736 P.2d 1201, 1203 (Colo.1987). In this case, as the trial court recognized and as the prosecution has conceded, there is no question that an interrogation took place and that no *Miranda* warnings were given. Our task is to decide whether the trial court was correct in ruling that the interrogation was custodial.

The test for whether a person is in police custody is "whether a reasonable person in the suspect's position would consider himself deprived of his freedom of action in any significant way." *Sandoval*, 736 P.2d at 1203. The fact that a person is interrogated in his own home does not make the interrogation noncustodial as a matter of law. *Orozco v. Texas*, 394 U.S. 324, 326–27, 89 S.Ct. 1095, 1096–97, 22 L.Ed.2d 311 (1969). Application of the "reasonable person" test requires an objective assessment of whether a reasonable person in the defendant's circumstances would have believed that he was free to leave the officer's presence, and does not turn on the subjective beliefs of either the suspect or the law enforcement officer. *People v. Thiret*, 685 P.2d 193, 201 (Colo. 1984). In making this determination, the trial court must consider the totality of circumstances surrounding the interrogation. *Sandoval*, 736 P.2d at 1203. Among the factors the court should consider are:

> [T]he time, place and purpose of the encounter; the persons present during the interrogation; the words spoken by the officer to the defendant; the officer's tone of voice and general demeanor; the length and mood of the interrogation; whether any limitation of movement or other form of restraint was placed on the defendant during the interrogation; the officer's response to any questions asked by the defendant; whether directions were given to the defendant during the interrogation; and the defendant's verbal or nonverbal response to such directions.

*Thiret*, 685 P.2d at 203.

The trial court made detailed findings regarding these factors and determined that "from the overall totality of the circumstances, there was [a deprivation of freedom]." In particular the trial court noted: (1) the presence of two armed law enforcement officers in the defendant's house for the purpose of talking to the defendant about a crime; (2) the fact that the deputy initiated the conversation; (3) the officer's purpose of obtaining evidence against the defendant; (4) the deputy's subtle coercive influence over the defendant as a friend; and (5) the relatively long twenty to thirty minute interrogation.

The determination of whether an interrogation is custodial—whether a reasonable person would have believed that he was not free to leave—is a factual determi-

nation to be made by the trial court. *People v. Johnson*, 671 P.2d 958, 962 (Colo. 1983). We will overturn a trial court's factual finding only if it is not supported by competent evidence in the record. *People v. Parks*, 195 Colo. 344, 349, 579 P.2d 76, 79 (1978); *People v. Ellis*, 189 Colo. 242, 245, 539 P.2d 132, 135 (1975). Because we find the trial court's finding supported by the record, we affirm its order suppressing Cleburn's statements.[4]

### III.

We next address the trial court's order suppressing the rifle seized at Cleburn's home. Warrantless searches or seizures are impermissible if they do not fall within one of the recognized exceptions to the warrant requirements of the United States and Colorado Constitutions. U.S. Const. amend IV; Colo. Const. art. II, § 7. One exception is a search to which the defendant consents. *Thiret*, 685 P.2d at 200–01. The prosecution argues that there was no search because Cleburn voluntarily revealed evidence of a crime.

This court has held that "[a] search consists of a looking for or seeking out that which is otherwise concealed from view." *People v. Carlson*, 677 P.2d 310, 316 (Colo. 1984). In this case the officers entered Cleburn's house seeking a .30–.30 rifle that was concealed from view in Cleburn's bedroom closet. Their actions clearly constituted a search. The question is whether Cleburn consented to that search and the subsequent seizure of the gun.

■ For consent to be valid it must be found to have been given freely and voluntarily in light of the totality of the circumstances. *Thiret*, 685 P.2d at 201. Voluntary consent cannot be "the result of duress or coercion, express or implied, or any other form of undue influence exercised against the defendant." *Id.* In determining whether consent has been voluntarily given, the trial court should consider the defendant's age, education, intelligence and state of mind as well as the duration, location and other circumstances of the search. *Carlson*, 677 P.2d at 318. Knowledge of the right to refuse permission to conduct a search is also a relevant factor, although "not a prerequisite to establishing the voluntary character of a consent search." *Id.; People v. Helm*, 633 P.2d 1071, 1076 (Colo. 1981). The burden is on the People to show by clear and convincing evidence that consent was voluntary. *People v. Carlson*, 677 P.2d 310, 318 (1984); *Helm*, 633 P.2d at 1077 n. 8; *People v. Lowe*, 200 Colo. 470, 616 P.2d 118, 124 (1980).

■ When consent is given after an interrogation in violation of *Miranda*, the consent is likely to be constitutionally infirm, tainted by the unconstitutional interrogation. *See Lowe*, 616 P.2d at 124 (suppressing items obtained in search because search and consent to search were fruits of unlawful custodial interrogation); *cf. People v. Donald*, 637 P.2d 392, 394 (Colo. 1981) (consent to search apartment would likely be infirm as product of illegal entry); *Wong Sun v. United States*, 371 U.S. 471, 83 S.Ct. 407, 9 L.Ed.2d 441 (1963) (suppressing statements made incident to an unlawful arrest and subsequently seized narcotics as "fruits" of unlawful action). Because the defendant had already admitted owning the rifle and being involved in a "run-in" with the victim, he had nothing to lose by giving Alder the rifle. These circumstances support the trial court's determination that the rifle was obtained as a result of the illegal custodial interrogation.

■ The trial court also held that the People had not met their burden of establishing the voluntariness of the consent by clear and convincing evidence. The trial court noted that the questioning began at 7:00 p.m., there were two armed deputies in the defendant's home, the prior relationship between one of the deputies and the defendant made the questioning subtly coercive, the defendant was in custody, and the defendant had already made incriminating

---

**4.** The trial court's order suppressing the statements is supported on the basis that they were obtained by custodial interrogation without the benefit of *Miranda* warnings. Therefore, we need not consider whether the court correctly concluded that the statements were also involuntary.

statements without the benefit of a *Miranda* advisement.

Voluntariness is a question of fact. *People v. Carlson*, 677 P.2d 310, 318 (Colo. 1984). A trial court's finding, therefore, must not be overturned if the record contains competent evidence supporting it. *People v. Cummings*, 706 P.2d 766, 769 (Colo.1985); *People v. Medina*, 180 Colo. 56, 58, 501 P.2d 1332, 1332 (1972). Because we find the trial court's ruling supported by the record, we affirm the order suppressing the rifle seized at the defendant's home.

### IV.

In summary, we affirm the trial court's order suppressing statements made by the defendant and the rifle seized at his home. The case is remanded for further proceedings consistent with this opinion.

VOLLACK, J., dissents.

ROVIRA and MULLARKEY, JJ., join in the dissent.

Justice VOLLACK, dissenting:

The majority concludes that Deputy Sheriff Don Alder (Alder) was required to advise the defendant Charles Cleburn (defendant) of his *Miranda*[1] rights prior to questioning the defendant in his home because the setting was custodial.

I disagree with the majority affirmance of the trial court's finding that the questioning of the defendant in the kitchen of his home took place in a custodial setting. I believe, as we have previously held, that "the trial court's ultimate constitutional

ruling cannot be squared with the court's evidentiary finding of fact." *People v. Quezada*, 731 P.2d 730, 734 (Colo.1987).

### I.

The evidence from which the trial court made its findings was uncontradicted and reflects the following events. Alder was assigned on September 7, 1988, to investigate a report that someone menaced a young man. The incident took place in sparsely populated Colorado Acres in Western Fremont County. Alder interviewed the victim, who gave him a description of an older person. The victim's description matched the defendant. Alder and posseman Dan Ogden[2] contacted the defendant at his home that evening. Alder advised the defendant that he needed to talk to him, whereupon the defendant invited Alder and Ogden into the kitchen. Alder asked the defendant, in the presence of Ogden and the defendant's wife, if he had had a run-in with a young kid that afternoon after school, to which the defendant replied "Yes."[3]

Alder advised the defendant that the young kid said that there had been a weapon, and Alder asked the defendant if he used any sort of a weapon. The defendant's wife responded that the defendant had a BB gun. Alder asked the defendant if he had any hunting rifles. The defendant acknowledged he had hunting rifles and shotguns. Alder and the defendant conversed in normal, calm tones, and neither one made demands or threats on the other. Alder asked the defendant about

---

**1.** *Miranda v. Arizona*, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966).

**2.** Alder testified that both he and Ogden were in uniform and both were armed when they went to the defendant's house. Alder also testified as follows:

Q: What did you—how did you make contact with him?

A: I walked up to his house and knocked on the door.

Q: And what happened then?

A: I went and asked him—I told him that I needed to talk to him. He told me to come on in, and so we went into his kitchen.

**3.** Alder testified as follows:

Q: Okay. What did you say to him at that time?

A: I told him—I asked him if he had a run in with a young kid that afternoon, that evening, after school.

Q: What did Mr. Cleburn respond to that?

A: He said, "Yes", he had.

Q: And how did you ask the question?

A: That's basically the way I did it. I was just standing there, and I said—I called him Bo. I said, "Did you have a run in with a young kid this afternoon?" I wasn't pushy or anything; loud.

his rifle collection.[4] Alder then advised the defendant that the young man described the weapon as a lever-action .30–.30, and inquired whether the defendant had such a gun. Alder prefaced his request to look at the defendant's lever-action rifle with the statement, "[y]ou don't have to let me." [5] After the defendant produced the .30–.30, Alder asked if he could take the rifle with him, and the defendant agreed.

Alder left the house, went to his car, and concluded that he should take the defendant into custody. Alder returned to the house, asked the defendant to step outside, and placed him under arrest.

## II.

A police officer is required to issue a *Miranda* warning when he subjects a person to interrogation in a custodial setting. There must be both custody and interrogation before *Miranda* warnings are required. *People v. Milhollin,* 751 P.2d 43, 49 (Colo.1988). The test for determining if a person is in custody, or in a custodial setting, is whether a reasonable person in the suspect's position would consider himself deprived of his freedom in a significant way. *Id.*

In *Oregon v. Mathiason,* 429 U.S. 492, 97 S.Ct. 711, 50 L.Ed.2d 714 (1977), a state police officer called the defendant and asked if he could meet with him to "discuss something." *Id.* at 493, 97 S.Ct. at 713. The defendant agreed to meet with the officer at the state patrol office. When they met at the office, the officer and the defendant sat across a desk in a closed room and the officer told the defendant that he was not under arrest. The officer then told the defendant that he wanted to talk to him about a burglary and that his truthfulness would possibly be considered by the district attorney or judge. The defendant then admitted taking the property. The Supreme Court held that there was "no indication that the questioning took place in a context where [the defendant's] freedom to depart was restricted in any way." *Id.* at 495, 97 S.Ct. at 714. The

4. Alder testified as follows:
Q: Did you ask anything else? Was there any further conversation between you and the Defendant at that time?
A: At that time, I asked him—I says [sic], "Do you have any rifles? Any hunting rifles?" And he said, "Yes." He says [sic], "I have a .270." And so I went and asked him, "Would it be all right if I looked at it?" And he said, "Yes."
Q: At that time, what did Mr. Cleburn do?
A: He got up out of the chair and started walking to the bedroom. Actually, we walked through the living room. And he got up and started walking that way.
Q: What did you do?
A: I went and asked him—I said, "Would it be all right if I come with you?"
Q: Why did you ask that question?
A: Well, two reasons: The first one was, I wanted to see what he was actually going to do and—but he was going in to mess with gun [sic], and I didn't like that; somebody going in to another room and coming back out with a gun.
Q: What was your demeanor at this time?
. . . .
A: Just following him; you know, not—I don't know how you want to say. We was [sic] still very calm, talking.
. . . .
A: . . . . I seen [sic] him move a gun in a scabbard to pick up another gun. And so he brought me the—he handed it out and come

walking around behind the door then and said, "Here it is." So I asked him, I said, "Is it all right to take it out of this here and take a look at it?" And he said, "Sure." And so I took it out and looked at it, and I checked and see [sic] if it was unloaded because I didn't want it laying around.

5. Alder testified as follows:
Q: Did you ask any further questions at that time?
A: Yeah. I asked him—I says [sic], "Well, the young kid had told me that there was a lever action rifle." And I says [sic], "Do you have something like that, like a .30–30?" I says [sic], "Would it be all right if I looked?" I says [sic], "You don't have to let me." And he says—"Well," he says, "I do have a lever action .30–30."
. . . .
A: Okay. Then I went and—I asked him, I says [sic], "Is this all?" I says [sic], "Could I take another look in your—back in here and see if you have any more rifles?" You know, "I don't have to—I mean, you don't have to let me in there if you don't want to." And he said, "No, you can come back and look." . . . .
. . . .
A: Okay. Then I said, "This here—the young kid said that it was a lever action that was shot at him." I said, "Would it be all right if I take this with me to take it and investigate it?" And he said, "Yes."

Court stated that the defendant "came voluntarily to the police station, where he was immediately informed that he was not under arrest. At the close of a ½–hour interview [the defendant] did in fact leave the police station without hindrance." *Id.* The court concluded that "[i]t is clear from these facts that [the defendant] was not in custody 'or otherwise deprived of his freedom of action in any significant way.'" *Id.* (quoting *Miranda v. Arizona,* 384 U.S. 436, 444, 86 S.Ct. 1602, 1612, 16 L.Ed.2d 694 (1966)); *cf. Orozco v. Texas,* 394 U.S. 324, 325, 89 S.Ct. 1095, 1096, 22 L.Ed.2d 311 (1968) (defendant questioned by police in his own bed found to be under custodial interrogation where testimony of police officers was that the defendant was under arrest and not free to leave).

In *People v. Thiret,* 685 P.2d 193, 203 (Colo.1984), we reversed the trial court's order suppressing statements made by the defendant during a conversation he had with an investigator from the district attorney's office. The trial court suppressed the defendant's statements because the investigator did not readvise the defendant of his *Miranda* rights. The facts of the case, however, demonstrated that the defendant entered the investigator's office and began conversing with him voluntarily. *Id.* The polygraph examiner placed the defendant in the investigator's office while the defendant waited for a ride home. *Id.* at 198. The defendant was not under arrest when he was in the investigator's office, and during the defendant's conversation with the investigator another officer interrupted and asked the defendant to let him know when he was ready to leave. *Id.* at 198. We held that the record was "devoid of any evidence to support the district court's determination that the defendant was 'in custody' at the time of the ... interview." *Id.* at 203. In *People v. Milhollin,* 751 P.2d at 49, we reached a similar conclusion. In *Milhollin* the defendant was riding a motorcycle when he became involved in an accident with a car. An officer investigating the accident found the defendant in a hospital awaiting surgery. Without advising the defendant of his *Miranda* rights, the officer asked the defendant if he was the rider of the motorcycle. The defendant responded that he was. We reversed the trial court order suppressing the defendant's statement that he was the rider of the motorcycle because we concluded that the defendant was not in a custodial setting. *Id.* at 50–51. We stated that there was "no evidence in the record to support the conclusion that the defendant, at the time he was asked whether he was the driver of the [motorcycle], reasonably believed that his freedom of action had been curtailed by the officer to a degree associated with a formal arrest." *Id.* at 52.

*Mathiason, Thiret,* and *Milhollin* dictate a result different from the one reached by the majority. Alder and Ogden visited the defendant at his home. When the defendant answered the door Alder did not ask if he could come in, but the defendant invited him in. Alder and his companion were in uniform, *see Milhollin,* 751 P.2d at 45, and Alder immediately asked the defendant if he had been involved in an incident with a young kid earlier that day. The defendant answered Alder's questions. When Alder asked the defendant if he owned a lever-action rifle like the one described by the victim, the defendant answered that he did. Alder then asked if he could see the gun, but reminded the defendant that he did not have to produce it. The defendant, however, produced the gun and let Alder take it with him. Under these circumstances, a reasonable person would have felt free at any time to end the conversation, ask Alder to leave, or leave himself. The situation was clearly distinguishable from an arrest. *Milhollin,* 751 P.2d at 52.

The trial court found that the defendant was in custody because Alder used the defendant's friendship with him to subtly coerce the defendant into revealing incriminating information.[6] There is no evidence

---

**6.** The trial court held that:

The court would find that from all of the facts present, the Defendant was in fact in custody; although there had been no technical arrest.

All of the facts, looking at the objective standards, leads a reasonable person to believe that he was in custody in fact. And then we have that subtle coercion, too. It's not the

to support this finding of the trial court. The only testimony at the pretrial hearing came from Alder. Alder did not suggest that he attempted to influence the defendant, and the record reveals that Alder was actually careful not to pressure the defendant. The court's findings of subtle coercion and custodial interrogation were based on a subjective test of Alder's friendship and not on objective evidence of whether a reasonable person in the defendant's position would consider himself deprived of his freedom in a significant way. I would hold as a matter of law that the trial court's ultimate constitutional ruling cannot be supported by the trial court's evidentiary findings of fact.

### III.

I disagree with the majority's conclusion that the trial court properly suppressed the lever-action rifle seized at the defendant's home. In my opinion the defendant voluntarily consented to Alder's seizure of the rifle.

The issue is whether, in light of the totality of the circumstances, the defendant's consent was freely and voluntarily given. *Thiret*, 685 P.2d at 201. The trial court concluded that the defendant did not voluntarily consent to the search and seizure because Alder used subtle coercion to obtain the defendant's consent,[7] and the defendant's consent was derived from Alder's exploitation of his failure to advise the defendant of his *Miranda* rights. I do not agree with the trial court's second reason because, in my view, there was no *Miranda* violation. *See* part II, above.

I also believe that the trial court erred in concluding that, on the basis of Alder's use of subtle coercion, the defendant's consent

was not voluntary. There is no testimony in the record to support the trial court's conclusion that Alder used the defendant's friendship with him to coerce the defendant to involuntarily consent to the search. The testimony in the record only supports the conclusion that the defendant and Alder were acquainted and were on good terms. Not every interaction between law enforcement officials and citizens who are acquainted produces an atmosphere of coercive pressure. *See People v. Nisser*, 189 Colo. 471, 542 P.2d 84 (1975) (no unreasonable search where undercover agent who is personally acquainted with defendant gains entry to defendant's residence by invitation and observes or is handed contraband). In this case there was no evidence to support the trial court's conclusion that Alder used his acquaintance with the defendant in a coercive manner.

Alder's manner indicates that he did not coerce the defendant into consenting to the search. Alder did not ask to simply "look around" before searching the defendant's closet. *Cf. Thiret*, 685 P.2d at 200 (defendant's oral consent to "look around" was not a consent to search). Alder told the defendant that the victim described the weapon as a lever-action rifle. Before the defendant produced the .30–.30, Alder reminded him that he did not have to show him the rifle. Despite this warning the defendant voluntarily produced the rifle.

*People v. Bowman*, 669 P.2d 1369 (Colo. 1983), involved an investigation of a suspicious fire by an investigator from the Aurora Fire Department. The investigator questioned the defendant after the defendant had left the scene of the fire. The investigator asked the defendant if he could see the pair of pants the defendant

---

threatening type of thing, but it is the use of a relationship by the Deputy. Whether he did it consciously or unconsciously, maybe, is immaterial. But the effect upon the Defendant that, you know, this is a friend who has come to help me; that type of thing. Where he had not been advised at all that a particular item was being sought for a specific criminal prosecution, and the Deputy knew all of this. He knew he was looking for a .30–30. He knew the Defendant was the one who was alleged to have pointed it prior to that at a victim.

7. The trial court found that

[a]s far as the consent is concerned, that goes under the totality [of the circumstances], too. It goes back to the friendship type of thing. The questioning was based upon that. And in the Court's opinion and finding, it implied subtly the relationship, and the consent flowed from that, and the same thing took place.

was wearing at the scene of the fire. *Id.* at 1377. The defendant consented and handed a burned pair of pants to the investigator. *Id.* at 1377–78. When the investigator observed the burn spots he asked the defendant if he could have the pants, and the defendant replied, "Yes." *Id.* at 1378. We noted that, "while the defendant's knowledge of his right to withhold consent is a factor to be considered, an advisement of this right is not a condition to a finding of voluntary consent." *Id.* at 1377. We held that "the evidence support[ed] the ruling of the trial court that, under the totality of the circumstances, [the defendant] voluntarily consented to relinquish the burned pants to the fire investigator." *Id.* at 1378. We also noted that

> [a]s in *People v. Elkhatib,* ... "there was no evidence of coercion, either in the form of an officer's claim of lawful authority to search regardless of the defendant's permission, or a threat or subtle promise calculated to flaw the defendant's judgment.... Nor is there any evidence of deception as to the officer's stated purpose" in examining the pants.

*Id.* (quoting *People v. Elkhatib,* 632 P.2d 275, 278 (Colo.1981)).

The same analysis applies in this case. There is no evidence that Alder used his acquaintance or friendship with the defendant to "subtly coerce" the defendant into producing the rifle. Alder did not deceive the defendant or make any subtle promises, hints or suggestions. Under the totality of the circumstances the defendant voluntarily consented to the search and seizure.

I am authorized to say that Justice ROVIRA and Justice MULLARKEY join in this dissent.