The PEOPLE of the State of Colorado,
Plaintiff–Appellant,

v.

John Mario MINJAREZ,
Defendant–Appellee.

No. 03SA219.

Supreme Court of Colorado,
En Banc.

Dec. 15, 2003.

G.F. Sandstrom, District Attorney for the Tenth Judicial District, Karl S. Tameler, Deputy District Attorney, Robert R. Case, Deputy District Attorney, Pueblo, Colorado, Attorneys for Plaintiff–Appellant.

David S. Kaplan, Colorado State Public Defender, Thomas B. Flesher, Deputy State Public Defender, Pueblo Regional Public Defender, Pueblo, Colorado, Attorneys for Defendant–Appellee.

Justice BENDER delivered the Opinion of the Court.

### Introduction

In this interlocutory appeal, filed pursuant to C.A.R. 4.1, the prosecution challenges the trial court's order suppressing statements made by the defendant to police officers during an interview at Children's Hospital in Denver, and statements subsequently made by the defendant to his wife in the officers' presence. The trial court held that all of the defendant's statements were elicited from the defendant in violation of *Miranda v. Arizona*, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966). We affirm in part and reverse in part. We hold that the defendant was in custody for *Miranda* purposes when he was questioned by the police officers and thus affirm the order of the trial court suppressing those statements. We also hold that the defendant was not subject to interrogation when he spoke to his wife in the officers' presence after the interview was over, and thus we reverse the trial court's order with respect to those statements.

### Facts and Proceedings Below

On November 17, 2002, the defendant, John Mario Minjarez, placed a 911 call during which he reported that his infant daughter, Juanita Minjarez, was not breathing. Police and emergency personnel arrived at the home and found the infant severely injured. She was taken to a local hospital and subsequently transferred to Children's Hospital in Denver. The defendant was questioned several times at his home by members of the Pueblo Police Department, including

Detective Patsy Archuleta, who is the lead detective in this case.[1] At that time, the defendant claimed the infant was injured when his one-year-old daughter accidentally knocked over the seat in which the infant was sitting, causing the infant to fall six inches and hit her head.

The following day, Detective Archuleta received information from Dr. Sirotnik, the treating physician at Children's Hospital, that the infant's injuries were not consistent with accidental injury. Rather, the extent and severity of her injuries suggested the infant had been shaken or subject to some other non-accidental trauma. Based on this and other information, Detective Archuleta obtained a warrant for the defendant's arrest. Later that day, Dr. Sirotnik called Detective Archuleta to inform her that the defendant was at the hospital.

Detective Archuleta told Dr. Sirotnik that she was coming to Denver to arrest the defendant. She then drove with Officer Raymond Purvis from Pueblo to Denver to execute the warrant.[2] After a two-hour drive, they arrived at Children's Hospital at approximately 6:00 p.m. Detective Archuleta had the warrant for the defendant's arrest in her pocket. The officers asked nurses in the neonatal ICU, where the infant was being treated, to provide them a room where they could speak to the defendant privately, and asked the nurses to bring the defendant to them. Detective Archuleta testified that she requested a private room to avoid creating a disturbance when the defendant was taken into custody.

The nurses showed Detective Archuleta and Officer Purvis into a meeting room a short distance from the area where the infant was being treated. The room had a long conference table and several chairs. After the defendant was taken to the interview room by the nurse, he sat down at the officers' request. The defendant was seated in a chair away from the door, and Detective Archuleta and Officer Purvis sat between him and the door. Once the defendant was shown to the room, the nurse closed the door, which remained closed throughout the interview. At no time during the interview was anyone else admitted to the room.

Officer Purvis and Detective Archuleta testified that the defendant cried on and off while he was questioned and that initially they could see he was emotionally distraught. The officers began to question the defendant immediately after he was admitted to the room. Officer Purvis testified that he told the defendant he was free to go at any time, and Detective Archuleta testified that she told the defendant he didn't have to say anything. At no time during the interview was the defendant advised of his *Miranda* rights or informed of the existence of the warrant.

Officer Purvis began the questioning in a conversational tone, but when the defendant responded with the same story he had told Detective Archuleta the day before, Officer Purvis' tone grew more accusing and confrontational. Officer Purvis told the defendant that the "medical evidence" contradicted his story, and that it would be better for the defendant to talk to Officer Purvis now and be honest about what happened.

From that point in the interrogation, Officer Purvis testified that the questioning proceeded with Officer Purvis providing details of what happened and the defendant agreeing. For example, in his report Officer Purvis wrote: "I told [the defendant] that he lost his temper and that he shook Juanita. I told [the defendant], 'this is what happened, right, you shook her—you lost your temper, and you shook Juanita.'" Later in the interview, Officer Purvis reported, "I told [the defendant] 'You shook her, didn't you?' And [the defendant] said, 'Yes.' I told [the defendant], 'You violently shook her,' and [the defendant] said, 'Yes.'" At one point, Officer Purvis informed the defendant, incorrectly, that the infant had a skull fracture, and when Officer Purvis suggested how this might have happened, the defendant agreed with Officer

---

1. These statements were ruled admissible by the trial court in another motion, and are not the subject of this appeal.

2. Purvis testified that he was a detective at the time of the investigation into Juanita Minjarez' injuries. He is now on patrol and was referred to as an officer at the time he testified.

Purvis' version of events. Detective Archuleta testified that about twenty minutes of the forty-five minute interview were comprised of this type of confrontational exchange.

Based on the defendant's admission that he shook the infant, Detective Archuleta and Officer Purvis formally arrested him, again without advising him of his *Miranda* rights, and then the defendant's wife was permitted to enter the room. Before she saw her husband, nurses had informed her that the defendant confessed to shaking the infant. In the officers' presence, the defendant had a brief conversation with his wife during which he said, "I'm going to take full responsibility for this." Detective Archuleta and Officer Purvis then transported the defendant to Pueblo, and during the trip, the defendant made unsolicited comments that he was "a monster." [3]

The trial court held that the defendant was in custody for *Miranda* purposes during his interview with Detective Archuleta and Officer Purvis and therefore prohibited the prosecution from using the statements made in the course of that interview as evidence in its case-in-chief. The court also held that the defendant's subsequent conversation with his wife was the functional equivalent of interrogation and ordered those statements suppressed as well.

Regarding the statements made while the defendant was being interviewed in the hospital, the trial court cited *People v. Matheny*, 46 P.3d 453 (Colo.2002), and articulated the standard we set forth in that case to determine whether a defendant is "in custody" for *Miranda* purposes. The court then made several findings of fact. First, the trial court found the officers were dishonest with the defendant "when Detective Purvis told him that he was free to leave." The court found that the officers drove two hours to execute the warrant, and that "[their] testimony that the Defendant was free to leave their presence once he came into the interview room" was incredible. The court then made the following findings regarding the character and tone of the forty-five minute interview: the defendant was isolated with the two de-

tectives; the defendant was "directed to the chair farthest from the door and had two officers between him and the door"; and the officers communicated their belief in the defendant's culpability. The court found the overall tone of the interview to be "accusatory" and "confrontational," especially when Officer Purvis referred to the "medical evidence" that refuted the defendant's story. The court found that Officer Purvis was "empathetic towards the [infant] and raised his voice to emphasize the violent nature of the act" and that the police used leading questions and "played on [the defendant's] emotions by ... conducting a confrontational interview."

The trial court also addressed the existence of the warrant in its findings. The court reiterated that the officers went to Denver for the purpose of arresting the defendant and stated that the officers' testimony that they would allow the defendant to leave was "incredible as a matter of law."

Overall, the court concluded, "In reviewing the facts of this matter and looking at the totality of the circumstances, the Court finds that the Defendant in this matter was 'in custody' at the time he was interrogated by the two police officers" at the hospital.

With respect to the statements the defendant made to his wife, the court noted briefly: "The Court finds that to allow into a room a spouse, who has just been told that her husband has confessed to seriously injuring their child is the functional equivalent of questioning and the Court orders that those statements be suppressed."

## Analysis

In 1966, the United States Supreme Court decided *Miranda v. Arizona*. Under this ruling, the state may not use in its case-in-chief any statement made by a suspect in the course of custodial interrogation unless the interrogation was preceded by certain warnings. *Miranda v. Arizona*, 384 U.S. 436, 444, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966). The *Miranda* Court was particularly concerned about the threat to the privilege

---

**3.** The trial court ruled that these statements were made voluntarily and spontaneously and were

not elicited in violation of *Miranda*. Thus, the court ruled that these statements are admissible.

against self-incrimination posed by coercive interrogation techniques applied to individuals who are isolated and deprived of contact with friends and family. *Id.* at 461, 86 S.Ct. 1602. Such an environment, according to the Court, "is created for no purpose other than to subjugate the individual to the will of his examiner." *Id.* at 457, 86 S.Ct. 1602.

■■■ *Miranda* applies only "where there has been such a restriction on a person's freedom as to render him 'in custody.' " *Matheny,* 46 P.3d at 463 (quoting *Oregon v. Mathiason,* 429 U.S. 492, 495, 97 S.Ct. 711, 50 L.Ed.2d 714 (1977)). Under this Court's prior case law, whether a person is in custody for *Miranda* purposes is a question of law that we review de novo. *Id.* at 462, 86 S.Ct. 1602.

In *Matheny* we explained that an "in custody" determination involves two discrete inquiries. The first requires a trial court to establish the circumstances surrounding the interrogation, and the second asks whether, under those circumstances, there was a "formal arrest or restraint on freedom of movement of the degree associated with a formal arrest." *Id.* at 459 (quoting *Thompson v. Keohane,* 516 U.S. 99, 112, 116 S.Ct. 457, 133 L.Ed.2d 383 (1995))(further citations omitted).

■■■ The first inquiry is distinctly factual, and thus we will defer to a trial court's findings of historical fact and credibility findings so long as they are supported by competent evidence in the record. *Id.* at 462. The second inquiry is legal in nature and requires a court to apply the correct legal standard to the historical facts. *See id.* at 459. Provided a trial court's findings of fact are adequately supported by the record, our primary task on review is to determine whether, given the circumstances of the interrogation, the trial court correctly determined whether a reasonable person in the defendant's position "would believe that his freedom of action had been curtailed to a degree associated with formal arrest." *Id.* at 464 (citing *Berkemer v. McCarty,* 468 U.S. 420, 440, 104 S.Ct. 3138, 82 L.Ed.2d 317 (1984)).

■■■ When applying this objective legal test, a court must look to the totality of the circumstances under which the questioning occurred. *See Matheny,* 46 P.3d at 459–60; *People v. Horn,* 790 P.2d 816 (Colo.1990). A court may consider many factors, but no single factor is determinative, and a court is not limited in the number of factors it may consider. Rather, the most important consideration is whether the trial court accurately evaluated the "totality of the circumstances" when making its "in custody" determination. *See Matheny,* 46 P.3d at 464 ("[A] court must examine all of the circumstances surrounding the interrogation.") (quoting *Stansbury v. California,* 511 U.S. 318, 322, 114 S.Ct. 1526, 128 L.Ed.2d 293 (1994)); *see also People v. Thiret,* 685 P.2d 193, 203 (Colo.1984) (reversing the trial court's in custody determination because the court's analysis focused on a single factor rather than the totality of the circumstances). To guide this inquiry, we have suggested a number of factors a court may consider, including the time, place and purpose of the encounter; the persons present during the questioning; the words used by the officers; the tone of voice of the officers and the general mood of the interrogation; whether the defendant is restrained in any way; and whether the defendant is given any instructions. *See Matheny,* 46 P.3d at 465–66 (quoting *People v. Trujillo,* 938 P.2d 117, 124 (Colo.1997)).

■■■ Despite the broad range of factors a court may consider, we have made clear that a court may not rest its conclusion that a defendant is in custody for *Miranda* purposes upon "a policeman's unarticulated plan." *Matheny,* 46 P.3d at 464 (quoting *Stansbury,* 511 U.S. at 323–24, 114 S.Ct. 1526). In other words, a police officer's knowledge, intentions, or beliefs are only relevant to a custody determination to the extent that they affect how a reasonable person in the defendant's position would evaluate his situation. *See id.* The mere existence of an arrest warrant, a police officer's undisclosed plan to take a suspect into custody, or a police officer's firm but unstated belief in the defendant's culpability do not, by themselves, establish that a defendant is in custody for

*Miranda* purposes.[4] These factors are relevant "only to the extent they would affect how a reasonable person in the position of the individual being questioned would gauge the breadth of his or her freedom of action." *Id.* at 464–65, 86 S.Ct. 1602 (quoting *Stansbury*, 511 U.S. at 325, 114 S.Ct. 1526).

While we have never reviewed a scenario precisely like the one at issue in this case, our prior custody cases illustrate the range of factors a court may consider in evaluating whether a defendant is in custody. In *Matheny*, we held that the trial court erred by basing its custody determination on the fact that the officers intended to arrest the defendant from the outset of questioning. *Matheny*, 46 P.3d at 468. Applying the reasonable person standard, we concluded that the suspect was not in custody for *Miranda* purposes because, although the questioning took place in a secured area of a police station, the defendant drove himself to the police station voluntarily, was relaxed throughout the interview, was accompanied by his mother, and told his story in narrative form. *Id.* at 467, 86 S.Ct. 1602. Further, the trial court noted that the officers were polite during the questioning and spoke with a soft tone of voice. *Id.* at 467, 86 S.Ct. 1602. Similarly, we held that the suspect was not in custody in *People v. Thiret* because the suspect went voluntarily to the police station, was told he was not under arrest, and was informed by an officer at one point during the questioning that he could let him know when he was ready to go. *Thiret*, 685 P.2d at 203.

By contrast, we upheld the trial court's conclusion that the defendant was in custody in *People v. Horn*. In that case, despite the fact that the defendant was told he was free to go, the officers repeatedly accused the defendant of lying and encouraged the defendant to reconsider his answers; the officers confronted the defendant with the evidence against him; the interview was accusatory from the outset; and the court concluded that the "sole purpose of the questioning was to obtain a confession from the defendant." *Id.* at 818–19.[5] We also upheld the trial court's determination that the defendant was in custody in *People v. Cleburn*, 782 P.2d 784 (Colo.1989).[6] In that case, the defendant was interviewed in his home by two armed police officers. The trial court emphasized that the officers initiated the questioning, the questioning was conducted for the sole purpose of obtaining evidence against the defendant, the officers (who were well-acquainted with the defendant) exerted a "subtle coercive influence over the defendant as a friend," and the questioning, which lasted about 25 minutes, was relatively lengthy. *Cleburn*, 782 P.2d at 786.

With these examples in mind, we now turn to the present case to determine whether the defendant was "in custody" for *Miranda* purposes when he was questioned by Detective Archuleta and Officer Purvis.

---

4. We note that other jurisdictions have reached different conclusions where police officers possess a warrant. For example, in *State v. Wolfe*, 295 Or. 567, 669 P.2d 320 (1983), the Oregon Supreme Court held that police engaged in flagrant misconduct when they arrived at the suspect's house with a warrant and asked questions before they executed the warrant and advised the suspect of his *Miranda* rights. *See also Commonwealth v. Pitts*, 740 A.2d 726 (Pa.Super.1999) (suspect "in custody" because suspect would never have been allowed to leave and was going to be arrested); *State v. Sosinski*, 331 N.J.Super. 11, 750 A.2d 779 (App.Div.2000) (statements suppressed where police question suspect with warrant in pocket in a deliberate attempt to avoid *Miranda*). *But see State v. Edwards*, 589 N.W.2d 807 (Minn.App.1999) (warrant immaterial because suspect volunteered information in an attempt to receive favorable treatment); *People v. Bury*, 199 Ill.App.3d 207, 145 Ill.Dec. 281, 556 N.E.2d 899 (1990) (warrant immaterial where

defendant questioned in his home in wife's presence).

5. Because *People v. Horn* was decided before *Matheny*, we reviewed that case under a more deferential standard than we use today. *See Horn*, 790 P.2d at 818 ("The determination of whether an individual was 'in custody' as a result of being deprived of his liberty in a significant way is a question of fact which must be expressly made by the trial court.") (citation omitted). We note, as we did in *Matheny*, however, that the trial court in *Horn* not only made findings of fact that were adequately supported by the record but also applied the correct legal standard to those facts. *See Matheny*, 46 P.3d at 466 n. 6 (citing *Horn* with approval).

6. As with *Horn*, *Cleburn* was decided under our pre-*Matheny* standard of review. *See supra* note 4.

## Application

The People contend that the trial court misapplied *Matheny* by basing its custody determination on the existence of the warrant and by considering the police officers' opinion as to their belief in the defendant's guilt as a separate factor. The People urge this Court to apply *Matheny* "correctly" to the facts of this case and hold that the defendant was not in custody when he was questioned by Detective Archuleta and Officer Purvis. In response, the defendant argues that the trial court properly determined that the defendant was in custody when he was questioned by police officers at Children's Hospital in Denver.

■ We agree that the trial court over-emphasized the legal significance of the warrant. The court made two findings with respect to the warrant, which we address in turn. First, the court found "that when the police have a properly authorized arrest warrant for an individual and he is to be interrogated on the specific case for which the warrant has been issued, this is [an] additional factor the court can consider in determining, in the totality of the circumstances, whether an individual is in custody for purpose [sic] of a *Miranda* advisement." This finding is not per se incorrect, but it must be evaluated in light of our holding in *Matheny*. As we explain above, a police officer's "unarticulated plan" has no bearing on whether an individual is in custody for *Miranda* purposes unless that plan would somehow affect the way a reasonable person would perceive his situation. *See Matheny*, 46 P.3d at 464–65. Thus, a trial court may consider the existence of the warrant as part of the totality of the circumstances, but only to the extent that the warrant affects the perception of the defendant.

Second, the court concluded that, because the officers had a warrant in their possession that they intended to execute that evening, their testimony that they would "allow the Defendant to leave the room any time he wished and just arrest him later is incredible as a matter of law." This finding is incorrect, but it does not affect our determination of whether the trial court applied the correct legal standard in its "in custody" analysis.

■ A trial court may conclude that testimony is "incredible as a matter of law" only when a witness's testimony conflicts with nature or fully established facts. *See People v. Ramirez*, 30 P.3d 807, 809 (Colo. App.2001). Testimony rises to this level of incredibility when a witness describes events she could not possibly have seen or that are not possible under the laws of nature. *See U.S. v. Emerson*, 128 F.3d 557, 561 (7th Cir.1997); *U.S. v. Lerma*, 657 F.2d 786, 789 (5th Cir.1981); *State v. Hornsby*, 858 S.W.2d 892, 894 (Tenn.1993); *Chapman v. State*, 69 Wis.2d 581, 230 N.W.2d 824, 825 (1975). On the other hand, testimony that is merely biased, conflicting, or inconsistent is not incredible as a matter of law. *See People v. Franklin*, 645 P.2d 1, 5 (Colo.1982); *Ramirez*, 30 P.3d at 809. In this case, the trial court erred in concluding that the officers' testimony that the defendant was free to leave if he had wished was incredible as a matter of law. The trial court may make factual credibility determinations based on impressions formed while the officers testified. *See Page v. Clark*, 197 Colo. 306, 592 P.2d 792, 796 (1979). In this case, the court did exactly that when it found that the officers were dishonest with the defendant and that their testimony that the defendant was free to leave if he chose to do so was not credible. A trial court may not, however, reach legal conclusions that are not supported by the record. Thus, while we defer to the trial court's factual and credibility determinations, we hold that the officers' testimony with respect to the defendant's freedom to leave is not incredible as a matter of law.

■ Nonetheless, despite our conclusion that the trial court misconstrued the legal significance of the warrant, our review of the record and of the final order reveals that the trial court based its "in custody" determination on far more than the existence of the warrant. *Cf. Matheny*, 46 P.3d at 468 (reversing trial court's custody determination because it was based primarily on the conclusion that officers intended to arrest the defendant from the outset of the questioning).

The trial court made detailed findings of fact, which are supported by competent evidence in the record and which support the conclusion that a reasonable person in the defendant's position would believe that his freedom of action was curtailed to a degree associated with formal arrest. The court found that the police officers were dishonest with the defendant and that their testimony regarding the defendant's freedom to leave the interview room was not credible. The questioning took place in a private room, and the officers, intentionally or not, physically separated the defendant from the door. The officers initiated contact with the defendant, who was visibly emotionally distraught both at the outset and throughout the interview. Once inside the interview room, the defendant was alone with the officers and was seated in the farthest chair from the door while the officers sat between him and the door.[7] Significant portions of the interview proceeded in a highly confrontational and accusatory atmosphere that was clearly aimed at obtaining a confession. The interrogating officer's questions provided all of the details of the incident and were designed essentially to force agreement from the defendant. And the interrogating officer confronted the defendant with the evidence against him and with his own belief in the defendant's guilt.

■ These factors are all relevant to the question whether, under the totality of the circumstances, a person in the defendant's position would consider himself to be deprived of his freedom of action to a degree associated with formal arrest. The People's argument that the trial court should not have considered the fact that the interrogating officer communicated his belief in the defendant's culpability to the defendant as a separate factor is unpersuasive. Nothing in our case law limits the number of factors a court may consider when it analyzes the circumstances under which an interrogation took place. On the contrary, a trial court's first responsibility in any "in custody" analysis is to "examine all of the circumstances sur-

rounding the interrogation. . . ." *Matheny*, 46 P.3d at 464 (quoting *Stansbury*, 511 U.S. at 322, 114 S.Ct. 1526). In this case, the trial court did precisely that.

■ Our only remaining task, then, is to determine whether the trial court applied the correct legal standard to the historical facts. *See Matheny*, 46 P.3d at 459. As we explain above, the trial court did misinterpreted the legal significance of the warrant. However, the trial court made additional, sufficient, and detailed findings of fact, all of which are supported by competent evidence in the record. The court also applied the "reasonable person" test to those facts and determined that, given the totality of the circumstances, the defendant was in custody when questioned. This is precisely the analysis we held applies when a court is determining whether a person is "in custody" for *Miranda* purposes. *See Matheny*, 46 P.3d at 459–60.

However, even if we assume the trial court incorrectly applied the standard articulated in *Matheny*, under de novo review, we hold that the defendant in this case was "in custody." The totality of the circumstances surrounding the interrogation establish that a reasonable person in the defendant's position would not think that he was free to leave the conference room once law enforcement officers began questioning him. As we explain above, we defer to a trial court's findings of fact if they are supported by competent evidence in the record. *Matheny*, 46 P.3d at 462. In this case, the trial court found the officers' testimony to be incredible, and its findings of fact regarding the circumstances of the interview are all supported by competent evidence. The defendant was questioned for forty-five minutes in a small room by two law enforcement officers who, by their seating arrangement, blocked the defendant's access to the only door. Unlike the defendant in *Matheny*, the defendant in this case was emotionally distraught, and the tone of the interview was confrontational and accusatory. The officers told him "it would be better . . . to talk now." The defendant did

---

7. The court found that the defendant was "directed to the chair in which he was furthest from the door." Our review of the record reveals that this finding is somewhat overstated. Archuleta testified that the defendant was asked to sit down, but there is no evidence in the record that the officers intentionally directed the defendant to any particular chair.

not give his statements in a relaxed, narrative style but rather was confronted repeatedly with the interrogating officer's version of events and encouraged to admit that this version was accurate. As in *Horn*, the defendant was subject to repeated accusations. Overall, the mood in the room was tense and confrontational, and the defendant was subjected to the mode and manner of questioning that police use when a suspect is not free to leave—that is, after a suspect has been formally arrested and advised of his *Miranda* rights.

Here, viewing the totality of the circumstances, a reasonable person in the defendant's position would have considered that he was being restrained to a degree associated with formal arrest. It is certainly appropriate for police to use confrontational interrogation techniques to obtain evidence of criminal conduct. However, when police create an atmosphere equivalent to that of formal arrest by questioning a suspect who is isolated in a small room, by effectively blocking his access to the room's only exit, by confronting him repeatedly with the weight of the evidence against him, and by telling him that he is free to leave when all external circumstances appear to the contrary, they must begin this type of interrogation with the *Miranda* advisements. The officers' failure to so advise the defendant under these circumstances renders the defendant's statements inadmissible in the prosecution's case-in-chief, as the trial court concluded.

Finally, we address the trial court's order suppressing the statements the defendant made to his wife after he was taken into custody. The trial court summarily found that allowing into the interview a spouse who had recently been told that her husband confessed to injuring their child room is the functional equivalent of interrogation. In response, the People cite *People v. Gonzales*, 987 P.2d 239 (Colo.1999), in which we explained that "interrogation" means either express questioning by a police officer or "words or actions ... that the officer should know are reasonably likely to elicit an incriminating response from the suspect." *Gonzales*, 987 P.2d at 241 (citations and internal quotation marks omitted).

Police conduct may be considered the functional equivalent of interrogation if it employs "compelling influences or psychological ploys in tandem with police custody to obtain confessions." *Id.* at 242.

In this case, although the defendant was undeniably in custody when he was allowed to see and speak with his wife, the police did not engage in any psychological ploys to obtain incriminating evidence against him. Nothing in the record indicates that the officers made any tactical decision when they allowed the defendant to see his wife, and nothing in the record suggests that it was anything other than the defendant's own choice to speak to her. Thus, we hold that the defendant was not subject to the functional equivalent of interrogation when he made statements to his wife in the presence of the officers, and therefore those statements should not have been suppressed.

### Conclusion

For reasons set forth above, we hold that the defendant was in custody when he was questioned by police officers at Children's Hospital in Denver, and that he was not subject to the functional equivalent of interrogation when he subsequently spoke with his wife in the officers' presence. Thus we affirm in part, reverse in part, and remand to the trial court for further proceedings consistent with this opinion.

Justice COATS concurs in part and dissents in part, and Justice KOURLIS joins in the concurrence and dissent.

Justice COATS, concurring in part and dissenting in part.

Despite concluding that the trial court failed to apply the correct legal standard, maj. op. at 356, and "overstated" some of its factual findings, maj. op. at 356 n. 7, the majority nevertheless concludes that additional findings of fact by the trial court are sufficient to establish custody under the correct standard. Because I believe the existing record is wholly inadequate to support a *de novo* determination of custody by this court, I would reverse the trial court's clearly flawed ruling and remand for further pro-

ceedings. I therefore dissent from that portion of the majority opinion upholding suppression.

As the majority readily acknowledges, the trial court misapprehended the legal significance of the arrest warrant in this case. Its ruling left no doubt that it considered relevant to the determination of custody the fact that the detectives already had judicial authority to arrest the defendant and therefore must have intended to arrest him and, similarly, must have been dishonest in telling him that he was free to leave. As the majority points out, the totality of circumstances test for assessing the question of custody turns on the perceptions of a reasonable person in the defendant's position rather than the subjective intent of the officers. The trial court's legal conclusion was therefore fatally flawed.[8]

Nevertheless, the majority concludes that the police created "an atmosphere equivalent to that of formal arrest by questioning a suspect who [was] isolated in a small room, by effectively blocking his access to the room's only exit, by confronting him repeatedly with the weight of the evidence against him, and by telling him that he [was] free to leave when all the external circumstances appear[ed] to the contrary." Maj. op. at 357. In fact, these propositions are either completely unsupported by the record or are insufficient, to the extent that some find partial support, to justify a legal conclusion of custody.

Initially, the defendant was "isolated" only in the sense that the detectives were the only other persons in the room with him. Nothing in the record suggested that he was deceived or had not come into the room voluntarily. (He had been directed to that location by the nurses.) Nor did anything suggest that he wanted to have, or was in any way prevented from having, anyone else in the room with him. Hospital staff, rather than the detectives, closed the door as they left, and it was clearly not locked. When the defendant eventually asked for his wife, one of the officers immediately located her, and she was permitted to come in.

Similarly, the record did not indicate that the interview took place in a small room but rather in a comparatively large one. The only evidence concerning the nature of the room and the positioning of those present indicated that, unlike a typical police interrogation room, it was a hospital meeting room (as distinguished from a "private room"), large enough to house a table seating twelve, in addition to a television and other chairs positioned for watching. Nowhere was the location of the table described, relative to the door, nor was there any evidence to support a finding that the detectives were effectively blocking the defendant's access to the door, or even that they were sitting between him and the door. The only reference in the record to the relative positions of the participants indicated that the defendant was sitting some ten feet away from Detective Purvis and that Purvis and Detective Archuleta were nearer than the defendant to the door.

As the majority concedes, the undisputed testimony indicated the defendant was told that he need not talk to the detectives and that he was free to leave at any time, and the trial court made factual findings to that effect. The majority's qualification that "all external circumstances appear[ed] to the contrary," maj. op. at 357, was neither a finding of the trial court nor a permissible inference from the testimony. The trial court, in fact, found only that the detectives were dishonest in indicating to the defendant that he would be allowed to leave, and it was actually criticized by the majority for failing to appreciate that the question of custody turned on appearances rather than the intent of the detectives.

To the extent that the majority's inference is drawn from the trial court's finding that the detectives sat between the defendant and the doorway and the fact that the defendant was confronted with the evidence against him, the former was no more supported by the record than the trial court's finding that

---

**8.** *See Stansbury v. California,* 511 U.S. 318, 326, 114 S.Ct. 1526, 1530, 128 L.Ed.2d 293 (1994)(Remand required despite consideration of a number of appropriate factors, where trial court regarded officers' subjective focus on defendant as a suspect as significant in and of itself).

the defendant was directed to the chair furthest from the door, *see* maj. op. at 356, n. 7, and the latter, in itself, does not imply that the defendant must have felt that he was no longer entitled to withdraw from the interview.[9] The record is undisputed that only after the defendant made clear his wish to talk ("No, I'm talking") to the detectives and made several attempts to allay their suspicions by giving explanations that they knew to be medically impossible, did they challenge his account.[10]

Unlike the majority, I would not hold that two plainclothes detectives,[11] without visible weapons,[12] verbally confronting an unrestrained suspect,[13] in an unlocked hospital TV room,[14] after notifying him that he is free to leave rather than talk to them,[15] with the lies he has voluntarily told them in an attempt to shift suspicion away from himself, amounts to an infringement on his liberty to such an extent that it is commensurate with a formal arrest. At such a point, concessions by a suspect are, in my mind, more naturally explained by his realization that his attempts at deception have not only failed but have actually increased police suspicions, and that further fabrication will not improve his position, rather than because of any reasonable perception that he has, in effect, already been arrested.

Apprehending and punishing those who commit crimes, is not a contest requiring the perpetrator to be given a sporting chance to evade detection. In *Miranda v. Arizona,* 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966), the United States Supreme Court squarely rejected the notion that confessions are in some way unworthy evidence or an undesirable way of solving crimes. Instead, it sought only to provide an additional protection from police coercion in situations comparable to the inherently coercive atmosphere of the stationhouse interrogation. Because the defendant asserted and the trial court erroneously found it to be improper for officers to attempt a consensual interview with a suspect whom they already had grounds to arrest, the record in this case not surprisingly fails to address or support a finding of custody under the correct legal standard. Rather than attempt to pour the trial court's old findings into new bottles, I would remand for reconsideration in light of the proper legal standard.

I therefore concur in part and dissent in part.

I am authorized to state that Justice KOURLIS joins in this partial concurrence and partial dissent.

---

**9.** *See Oregon v. Mathiason,* 429 U.S. 492, 497, 97 S.Ct. 711, 714, 50 L.Ed.2d 714 (1977) ("Any interview of one suspected of a crime by a police officer will have coercive aspects to it, simply by virtue of the fact that the police officer is part of a law enforcement system which may ultimately cause the suspect to be charged with a crime. But the police officers are not required to administer *Miranda* warnings to everyone whom they question. Nor is the requirement of warnings to be imposed simply because the questioning takes place in the station house, or because the questioned person is one whom the police suspect."); *see also Matheny,* 46 P.3d at 468 (quoting *Mathiason* ).

**10.** *Cf. Matheny,* 46 P.3d at 466 (noting significance of fact that the "initial tone" was conversational).

**11.** *Cf. Matheny,* 46 P.3d at 456 (noting significance of fact that officers were not uniformed).

**12.** *Cf. People v. Polander,* 41 P.3d 698, 705 (defendant not confined at police station nor did officers draw guns, use handcuffs or otherwise demonstrate the kind of force typically associated with an arrest); *see generally* 2 Wayne R. LaFave, Jerold H. Israel & Nancy J. King § 6.6(f) (West Group, 1999 & Supp.2003)(A court is more likely to find custody for *Miranda* purposes if there is physical restraint such as handcuffing, drawing a gun, holding by the arm, or placing into a police car.).

**13.** *Id.*

**14.** *Cf. Matheny,* 46 P.3d at 466 (noting significance of unlocked interview room).

**15.** *Cf. Matheny,* 46 P.3d at 466 (noting such advisement as one indication that the defendant's freedom of action had not been curtailed).